UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT
FOR THE SOUTHERN DIVISION OF ALABAMA

RAY BALL,                                  *

    PETITIONER,                     *
                                  *

VS.                                        *     CASE NO: 2:06CV1139-MHT
                                  *

RICHARD ALLEN, COMMISSIONER,               *
ET. AL.,                                   *
                                  *

    RESPONDENTS.                    *


## HABEAS CORPUS PETITION


       This is a petition for Habeas Corpus relief pursuant to Rule 39(k) and encompasses Rule 32.1

thru 32.10 A.R.C.P.. The Petitioner, Ray Ball ("Ball") challenges his 2005 state charge of

solicitation to commit murder in the Circuit Court of Mobile County. He alleges that the state

suppressed exculpatory and impeaching evidence in violation of *Brady v. Maryland*, 373 U.S. 83

(1963), and its progeny. He further alleges that the state failed to correct false testimony of several

witnesses, in violation of *Giglio v. United States*, 405 U.S. 150 (1972). The Respondents filed an

answer and supplemental answer arguing that the Petitioner's conviction was justly found by a jury,

and *Brady* and *Giglio* claims were procedurally defaulted.[1] The Court read the record and received

argument on the direct appeal. Upon review of the pleading, exhibits and arguments, the Court of

Appeals affirmed the trial court's decision and thus, the Petitioner asks this Court to review the cause

and conclude that the Petitioner is entitled to habeas corpus relief on some of his claims.

_____

    [1]The state argument is the normal one year time for filing and/or could have been, but was
not brought up at trial does not apply in this case, because the claims were discussed in bench
discussions and on instructions to the jury.

## I.  PROCEDURAL HISTORY AND FACTS

In 2005, the Petitioner was convicted of solicitation to commit murder of his wife, and sentenced to a term of life imprisonment.[2] Ms. Ball was informed that her husband did conspire with a male associate of hers, that Mr. Ball wanted to kill, or to have her killed.  It was later discovered that the very person that was making these allegations, was none other than the very individual who wanted to kill her himself, just one and a half years earlier.  The informer blamed her for Mr. Ball being arrested on an unrelated charge, and he had entered a plea to protect her.  The informer and Ms. Ball did not call the police or notify anyone of the alleged intentions of Mr. Ball for some time.  Time in which they (the informer and Ms. Ball) had recorded several ongoing conversations dealing with this "joke" of which several other persons knew about and were engaged in.[3]  The witnesses continued to support this statement contrary to the allegation of the State's witness, Rodney Waldrop.  Waldrop is the one who supposedly made the contaminated tapes that were brought before the District Attorney.  Instead of allowing the police to infer the truth that there was no <u>intent</u> encompassed in the conversation about any of the alleged acts, the tapes and testimony could only be edited and the police would not allow this to be done.  Thus, the parties took it upon themselves to collect and manufacture the tapes, editing the necessary information to undermine the authorities of any actual criminal act that was never committed.  Therefore, the available jurors were called, questioned, qualified for the panel from which the jury that heard the case was selected, and the trial proceeded.

---

[2]The Petitioner was indicted for conspiracy and solicitation to commit murder.  The conspiracy charge was nolle prossed at the bar on the day of trial.

[3]Witnesses Couley, Mayhand, Howell, Allenbach and McCall, separately, supported the conversation was in fact a jest.

2

The only testimony in the case was by witnesses called by the State. According to the undisputed evidence[4], while the Defendant was in the course of joking around about the whole incident. Notwithstanding the language used, the intent was never implied, forced, furthered or supported beyond conversation. The monies given on the taped occasions are **inaudible** ... at convenient occasions where the prosecution implied her version of an inaudible point to mislead the jury and further contaminate the only evidence presented. She withheld the facts that the tapes were in fact, testified to by the Detective that the tapes have various background sounds and distinct clicks (which indicate the tape being turned off) at points that were inconsistent with the alleged facts testified to by the prosecutions witness. Also, the bench discussion of the charge to proceed upon was discussed, and the Honorable Judge Graddick asked the prosecution what, if any charge it was going to proceed with. He later stated himself (page 253, 20-23) that Nicolina Ball was not a victim of any act. The Judge truly set the case for an ambush attempt to see if there could be a conviction on so much untruth and unsupported evidence. Also instructing the jury, the Judge himself could not clearly explain the actual allegations against this Petitioner, as in the issue presented by Petitioner is captioned in the appellant's brief:

> "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO GIVE THE DEFENDANT'S REQUESTED CHARGES WHEN THE COURT FAILED TO SUBSTANTIALLY COVER THE INFORMATION COVERED IN THE REFUSED CHARGES."

Appellant captions the second issue presented by him as follows:

---

[4]Contaminated evidence that was never concluded to attest the true conversation in any ongoing sequence, without editing from either Rodney Waldrop and/or John Cruse.

3

"THE TRIAL COURT COMMITTED GROSS PREJUDICIAL ERROR

WHEN IT DENIED DEFENDANT'S REQUEST FOR AN ACQUITTAL

WHICH DENIED DEFENDANT AN OPPORTUNITY TO ADEQUATELY

RECEIVE A FAIR AND IMPARTIAL JUDGMENT."

Thereupon, the available jurors were called, questioned, qualified for the panel from which the jury

that tried the case was selected, and the trial proceeded. The only testimony in the case was by

witnesses called by the State. According to the undisputed evidence, while the defendant was in the

course of a known jest in messing around with a friend of a friend.

There was a response by the attorney for the State expressing disagreement with the position

taken by the defendant's attorney. The learned trial judge, whom we recognize as one of the ablest

trial judges of Alabama, and one who perhaps has no superior knowledge and understanding of the

relatively new Alabama Criminal Code, made it clear that he disagreed with the position taken by

defendant's attorney in his construction of the language of the Code section under which defendant

was indicted. (See first five pages of the bench discussion before jury selection).

## I.    BACKGROUND

Ray Ball was convicted by jury trial in the Circuit Court of Mobile County, Alabama and was

subsequently sentenced to life imprisonment.

Because the evidence presented at trial is in many ways critical to the habeas petition, a short

summary of that proof is in order. At trial, there were no official eyewitnesses to the on-going

conversations to support the introduction of the evidence allowed by the trial court, and subsequently

was testified as to the possible editing and alterations to the tapes, to consolidate them into one

seemingly ongoing conversation. No physical evidence linked Ball to any type of criminal conduct,

4

and the witnesses at trial testified that the Petitioner did, and was engaged, in a "just joking around" manner as it relates to this case and the following **entrapment.** However, sufficient circumstantial evidence was presented to convince the jury, that Mr. Ball committed the crime. Specifically, John Cruse testified, stating that it was a factual standing that Ray Ball and John Cruse did, in fact [jokingly] conspire together to commit the actual offense, and that he (Cruse) later wanted to prevent, but did engage in a conversation with a friend about the incident to make a believable situation out of a prank on the friend (Rodney Waldrop). This would be beneficial to the witness, as he had personal problems and the friend (Waldrop) had legal problems. The Petitioner states that the plot actually encompasses the witnesses, and the alleged victim (later stated in court by the Judge, that she was NOT a victim because no crime was committed against her). (Pg. 253, 20-23) John Cruse stated that the horseplaying that he was engaged in, was later recorded by means of a tape recorder on numerous occasions. This included numerous tapes and different types of conversations and background noises over a period of about four months. John Cruse testified, he was one of the witnesses that heard Mr. Ball say that he wanted to kill his wife. Contrary to the actual facts that the conversation was put together by him to make Waldrop, an alleged prison confidant of Cruse's, believe that the same was true. He testified that Mr. Ball had said to him that he wanted to hire someone to kill his wife, but the actual telephone call to Waldrop, came from John Cruse. John Cruse knew that it was all just a joke, along with other witnesses, and the same was testified to at trial by them. Cruse knew that he was since recanted his testimony, but, as the trial judge has discussed, this development is not sufficient to support a claim deserving of Appellant relief. Among other evidence, witnesses testified that Mr. Ball was "very submissive to his wife" and that he did everything that she asked of him, and he responded in a very positive manner, which is

inconsistent to his wanting to actually bring harm to her.

The Petitioner prays that habeas relief be granted because there were material *Brady* and *Giglio* violations in Ball's trial and conviction. The State can not be prejudiced or object to this Petitioner's filing on several grounds: First, that the statute of limitations contained in Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.A. § 2244(d), or the Alabama Rules of Criminal Procedure, Rule 54 for the filing of habeas petitions does not bar this petition. Second, substantively, that the issues raised by Ball's allegations rise to the level of *Brady* and *Giglio* violations. Third, in finding *Brady* violations on several of Petitioner's claims, the appellant judge did not give proper deference to state court decisions on those issues. After the court discusses the statute of limitations, which is not an issue, it should turn collectively to the remaining issues, which are necessarily intertwined.

## II.    DISCUSSION

### A.  STATUTE OF LIMITATIONS

The AEDPA establishes a one-year limitations period for bringing a habeas petition, running in this case from the enactment of AEDPA2, and discounting time when a properly filed state court collater review petition is pending. 28 U.S.C.A. § 2244(d). Ball's direct appeal was not final until August of 2006, within the one-year period following the enactment of AEDPA. Therefore this petition is properly filed within the meaning of § 2254(d)(2), and/or the Rule 54, and the one-year period has not expired before the acceptance and filing of this petition. The only issue pending is for the waiver of prepayment of filing fees. Compellingly, the State cites the recent decision of *Artuz v. Bennett*, 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000), in which the Supreme Court held that the failure to pay a required filing fee, prevents a petition from being properly filed, even though the petition

was received in the clerk's office. Had the State raised the issue of proper filing in its earlier statute

of limitations argument, this intervening change in the law may have been dispositive of this petition.

The State did not raise the statute of limitations argument previously in this litigation;

however, at that time, the State was arguing that Ball was not due any relief, and that the sentence

and conviction would stand unless barred by the statute, which they asserted had no connection with

the one year from the enactment of AEDPA by their interpretation. Ball offers the following:

The district court, in its discretion, can modify or vacate non-final orders at any point before

final judgment. Fed. R.Civ.P. 54(b); *Bon Air Hotel, Inc. V. Time, Inc.,* 426 F.2d 858, 862 (5th Cir.

1970); *3 Richards v. United States*, 67 F.Supp. 2d 1321, 1322 (M.D. Ala. 1999). However, litigants

should not use motions to reconsider as a knee-jerk reaction to an adverse ruling. *Id.* Nor can

motions for reconsideration be used to present new legal theories or to raise legal arguments that

could have been raised previously. *Publishers Resource, Inc. V. Walker-Davis Publications, Inc.*,

762 F.2d 557, 561 (7th Cir. 1985); *U.S. Fidelity & Guar. Co. V. John Buck Co.*, 2001 U.S. Dist.

LEXIS 17581, 2001 WL 1298708, at *1 (N.D. Ill., Oct. 24, 2001). Reconsideration could be proper

as a result of an intervening change in the law. *Richards,* 67 F.Supp. 2d at 1322. However,

reconsideration assumes that the argument on which the intervening change in the law bears, was

actually made in the first instance. The State did not argue proper filing. This court declines to

revisit its ruling to incorporate a legal argument that should have been made earlier. *American Home

Assurance Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237, 1239 (11th Cir. 1985) "There is

a significant difference between pointing out errors in a court's decision on grounds that have already

been urged before the court and raising altogether new arguments on a motion to amend; if accepted,

the latter essentially affords a litigant 'two bites at the apple.'

7

Of course, if AEDPA's time limit creates a jurisdictional requirement for the hearing of habeas petitions, Ball's failure to properly file his petition would strip this court of its ability to proceed. The subject matter jurisdiction of the court, or, rather, the lack thereof, may be raised at any time during the litigation. According to most courts, the status of limitations language under AEDPA is not jurisdictional; rather, it is an affirmative defense that may be waived by the government and may be subject to equitable tolling. See e.g., *Dunlap v. United States*, 250 F.3d 1001, 1007 (6th Cir. 2001); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (collecting cases); *Miller v. New Jersey State Dept. Of Corrections*, 145 F.3d 616, 617-18 (3d Cir. 1998); *Chiem v. Wells*, 2001 U.S. Dist. LEXIS 8365, 2001 WL 705830, at *5 n.9 (D.Me. June 21, 2001); *Fadayiro v. United States*, 30 F.Supp.2d 772, 779 (D.N.J. 1998); *Stang v. Smith*, 23 F.Supp.2d 972, 973 (E.D. Wis. 1998) (collecting cases). By so stating, these courts recognize that the language of AEDPA indicates that this requirement is only a statute of limitations, not a jurisdictional bar. For substantially, the reasons expressed in those opinions, this court agrees. Therefore, because this court is not compelled to reconsider the issue as a jurisdictional matter, and because the State has effectively waived the argument by not presenting it in a timely manner, the statute of limitations argument is foreclosed.

## B.  SUBSTANTIVE VIOLATIONS

Having dispensed of the procedural preliminaries, the Petitioner now turns to the substantive question of whether certain statements and evidence was suppressed by the prosecution, in violation of *Brady* and *Giglio*. The appellant judge should have found *Brady* and *Giglio* violations resulting from the suppression of pretrial tapes and statements.

However, the appellant judge did not undertake an analysis of the deference to be granted to

the prior state court decisions on these issues. As will be explained, having considered the state court decisions, the Petitioner asks this court to address the appellant judge's lack of a recommendation to take account of the deference due the trial courts.

Viewing the violations in the aggregate, the appellant judge should have found that they created a lack of confidence in the result of Ball's trial, such that there was a reasonable probability of a different result had the violations not occurred. Therefore, the Petitioner asks this Judge to order habeas relief to be granted. Although, if the court slightly modifies the requested relief, to take account of the proper deference to prior state court decisions, the court can adopt the crux of Petitioner's petition, and order habeas relief.

## 1.   LEGAL STANDARDS

### A. BRADY STANDARD

To establish a *Brady* violation, a Petitioner must show three things: "[(1)] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] the evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L.Ed. 2d 286 (1999). In considering the prejudice prong of this test, the Supreme Court has prescribed a cumulative analysis. *Kyles v. Whitley*, 514 U.S. 419, at 436 n. 10, 115 S. Ct. 1555, at 1567 n. 10, 131 L.Ed.2d 490 (1995). Therefore, in structuring this decision, the court will analyze for each individual piece of evidence whether it is favorable to the accused and whether it was suppressed. Once this process has been undertaken for all the disputed evidentiary material, those pieces of evidence that were suppressed and are favorable to the Petitioner will become part of a cumulative materiality inquiry. Habeas relief is appropriate if the cumulative effect of all of the

9

suppressions is to prejudice the Petitioner materially. Prejudice inheres when "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281; 119 S.Ct. at 1948.

## B. GIGLIO STANDARD

To establish a *Giglio* violation, a Petitioner must establish that the prosecutor knowingly used

perjured testimony or failed to correct what he subsequently learned was false testimony and that the falsehood was material. *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999). The materiality inquiry under *Giglio* follows a lesser standard than for violations of *Brady*. The standard for materiality is whether there is a reasonable likelihood that the falsehood could have affected the jury's verdict. *United States v. Alzate*, 47 F.3d 1103, 1110-11 (11th Cir. 1995).

## C. DEFERENCE TO DECISIONS OF STATE COURTS AEDPA CONSTRICTED THE AVAILABILITY OF HABEAS CORPUS RELIEF BY REQUIRING GREAT DEFERENCE TO THE PRIOR LEGAL OR FACTUAL DECISIONS OF THE STATE COURT

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

With this issue before the bar, the Petitioner again raises the matter of whether the tapes that were not disclosed to the officials, and/or included in the discovery did, in fact, complete a two prong

10

analysis thus; one, failure to provide material under the *Brady* discovery of evidence, and two, allowed contaminated evidence before the jury for its consideration in the process of legal standards of which prosecution undermined the court by its mere presentation, in violation of *Giglio.*

Note: 28 U.S.C.A. § 2254(d)

A legal decision by a state court may be "contrary to" clearly established federal law in two ways: (1) when it reaches a conclusion contradictory to that of the Supreme Court on a legal question, or (2) it confronts materially the same facts as those in a Supreme Court decision and nevertheless reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 1519, 146 L.Ed. 2d 389 (2000). To be "contrary," the state court's decision must be substantially different from government precedent. *Id.*

A legal decision "involves an unreasonable application" of federal law" if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from precedent to a new context where it should not apply or unreasonably refuses to extent that principle to a new context where is should apply." *Id.* at 406, 120 S.Ct. at 1520.

The claim may also be reviewed if the decision of the state court was based on an unreasonable factual finding based on the evidence. See 28 U.S.C.A. § 2254(d)(2). A factual finding made by a state court is presumed to be correct, and the Petitioner may rebut that presumption only with clear and convincing evidence. *Id.* § 2254(e).

2.    SUBSTANTIVE CLAIMS

A. WALDROP/CRUSE TAPES

The tapes were tape-recorded, over several months time frame and edited by various means

11

in that time. The defense was not provided a transcript of the several recorded tapes or a copy of the recordings that relate to the other conversations, to infer that there was actual conversation that was later edited and could not have been proven beyond reasonable doubt, due to the content of those tapes.

Cruse was interviewed by the District Attorney's office, and later by Detectives. This interview was also in violation to the evidence presented, in so much that it was stated at trial that the actual tapes were made by Waldrop and NOT Cruse, who held the interviews with the police and the District Attorney's office, and therefore should be determined to be contaminated as the recordings offered were already re-recorded by Cruse.

### (1) DEFERENCE TO STATE COURTS

The state courts explicitly considered this issue now before this court on habeas review; the suppression of the Waldrop/Cruse tapes as a *Brady* violation. At trial, John Cruse was a crucial witness for the prosecution, alleging that Mr. Ball consistently engaged in conversation, involving threatened physical harm, which was proven to be false. The element of criminal acts to be considered, is that it was well established "they" were just horsing around. As the trial judge reconsiders the issue of the suppressed Cruse tapes, without engaging in the analysis required under 28 U.S.C.A. § 2254(d), this court should now decide whether deference was properly granted to the relevant state court decisions.

### (A) UNREASONABLE APPLICATION OF CONSTITUTIONAL LAW

The Judge is asked to find that the circuit court is permitted to revisit the state court *Brady* findings because the application of the *Brady* framework by the state court was unreasonable in light of relevant Supreme Court precedent, specifically that the state court may not have engaged in an

12

item-by-item materiality inquiry in determining whether a *Brady* violation occurred.  This mode of analysis is explicitly foreclosed by the Supreme Court decision of *Kyles v. Whitley*, 514 U.S. 419, 436-37, 131 L.Ed.2d 490, 115 S.Ct. 1555, 1567 & n.10., which makes clear that, once the suppression of *Brady* material (that is, impeachment or exculpatory evidence) is found, the court must make the materiality inquiry for all suppressions in the aggregate.  If the effect of all the violations, considered collectively, is to reduce confidence in the verdict such that there is a reasonable probability that it would have been different had the violations not occurred, then a *Brady* violation must be found.

The question is whether the state court impermissibly engaged in an item by item inquiry. It does not appear that it did so; instead, the state court analyzed item-by-item whether the information had been suppressed.  The Alabama Court of Criminal Appeals found that, for all but one of the argued pieces of evidence, Mr. Ball did not present evidence showing suppression. *Spellman v. State*, 744 So.2d 959 (Ala.Crim.App. 1998) (unpublished table decision), Memorandum Order at 3, released November 20, 1998.  With respect to the *McGinnis* statements, the only piece of evidence that the Court of Criminal Appeals did not dismiss on suppression grounds - - that court "agreed with the circuit court that because there is no reasonable probability that admission of this statement would have resulted in a different outcome, the statement did not fall under *Brady*."  *Id.* Having conceivably found only one suppression, the state court was not obligated to undertake the materiality inquiry "collectively" for all of the presented claims.  *Kyles*, 514 U.S. at 436 n. 10, 115 S.Ct. at 1567 n.10. ("This court is asked to evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion.") (Emphasis added). Only after a piece of evidence is identified as (1) having been suppressed, and (2) as being either exculpatory or impeachment

13

evidence, does the materiality inquiry come into play. Therefore, the Criminal Appeals Court's discussion of materiality inquiry comes into play. Therefore, the Criminal Appeals Court's discussion of materiality as to the one arguably suppressed piece of evidence is sufficient and a proper application of *Brady*. However, the claim may be reviewed based on that court's unreasonable factual conclusions in reaching its *Brady* decision on the Cruse tapes. Because of the factual missing tapes that were used to produce the "one" tape supplied for evidence by the State was never evaluated of its consistency or editing being undisputed, as testified by the only Detective in this matter.

## (B) UNREASONABLE FACTUAL DETERMINATION

The state court trial judge is asked to revisit and consider the *Brady* implications of the Cruse tapes. This is based on the fact that Ball's counsel had been told by the prosecution that Cruse did not initially submit the original tapes or identify his client because Cruse was afraid of the officials reactions. Finding that this description was inconsistent with Cruse's taped conversations with Mr. Ball and others, the state court should find *Brady* violations and suppress the contents of that tape. The Alabama Court of Criminal Appeals noted that the trial court found that Ball's counsel was told "of the substance of Cruse's statement, particularly that Cruse did not initially identify Ball, due to a fear of Ball going ahead with the act, agreeing with the trial court that there was no suppression of Cruse's statements, and, consequently causing a *Brady* violation. This decision, that there was no *Brady* violation, is a legal one. This circuit court may revisit that decision because one of the prongs of 28 U.S.C.A. § 2254(d) is met, which is to say, the decision was contrary to, or based on an unreasonable application of clearly established federal law, or was based on an unreasonable view of the facts in light of the evidence presented to the state court by presenting contaminated evidence.

14

The summary of the conversation given to the prosecutor, that Cruse did not initially tape himself, or so indicated to the prosecutor, does not accurately describe the substance of the taped conversations. It was an unreasonable interpretation of the facts for the state trial court, and state appellate courts to so find that the tape was a single piece of evidence, when in fact the tape was an edited version of tapes made over a four month time frame.

Based on this unreasonable interpretation of the facts, they found that no suppression had occurred because the prosecution tendered to Ball, the substance of the statements and the edited tape. Ball did not know, and as not told by the prosecution, that Cruse identified Rodney Waldrop of making the tape, and not himself. Rather than be honest with the police and the District Attorney, Cruse did undermine the judicial process by contaminating evidence before turning the entrapment material over to the police and acting thereon with knowledge that the truth was not known and hidden from prosecution for the personal enrichments and benefits falsifying the pending acts. Ball also did not know, and as not told by the prosecution, that Cruse's initial statement was inconsistent, in several ways, with his testimony at trial. The prosecution capitalized on the entirely ephemeral consistency of Cruse's trial testimony by telling the jury, that his story had not been changed from day one, when indeed it had. Cruse possessed the tapes and edited the tapes to benefit him and afterward introduced the same on-going entrapment with the police detective by carrying on in a manner that the jest was still in play, with the Petitioner in his pocket. Thus, acting as an agent for the prosecution and the police, the police detective did not lie on the stand to support the testimony of the witness, instead he destroyed the only evidence the state offered by acknowledging the background differences and the fact that if it were true that Waldrop was the one recording the conversations, how and why did the tape record conversation after he alleged went to change the tape

15

over and the distinct click was well after that time frame.

Under 28 U.S.C.A. § 2254(d), this court may review the *Brady* claim as to the WaldropCruse tapes.

## (2) *BRADY* IMPLICATIONS

With regard to the Waldrop/Cruse tapes, Cruse's testimony at trial contrasted with his statements over the range of tapes, establishes the impeachment character of the tapes. A number of significant inconsistencies become apparent when the recorded statements are compared with his trial testimony. Secondly, it is apparent that the tapes were not turned over to the District Attorney or Ball, before trial. That is, they were suppressed by the prosecution agent or officer as included because Cruse and Waldrop were allowed to proceed upon their own to record other conversation without the supervision of any official. Therefore the agent officer or prosecutor rule would encompass them collectively.

## (3) *GIGLIO* IMPLICATIONS

The prosecutor at Ball's trial emphasized the unchanging nature of witness Cruse's testimony. Even though he was actually or constructively aware of the tapes in which Cruse tells a markedly different story to investigators. As Cruse was the sole witness to the numerous tape recordings, he alone could alter and edit any tape to his convenience. The variance in his story would have been very helpful to a successful defense. This court should follow the repetitive judge's recommendations on this issue, and for substantially the reasons contained therein, that it is reasonably liked that the violation of *Giglio*, as to the Cruse tapes, could have affected the jury's verdict. Especially, when considered in conjunction with the other violations outlined in this opinion, the prosecutor's actions on this account are not excusable under the law. This fact alone

16

did not change the outcome of this trial and the conviction based upon the same, should be vacated.

<u>BATSON VIOLATIONS</u>

This cause was appealed to the Alabama Criminal Court of Appeals in order for the prosecutor to come forward with race neutral explanations for her peremptory strikes of white prospective jurors. <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L. Ed.2d 69 (1986). The trial court was asked to evaluate these reasons in accordance with <u>Ex parte Branch</u>, 526 So.2d 609, modified on rehearing (Ala. 1987). The appellant in this case is white. <u>Powers v. Ohio</u>, U.S. 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); <u>Ex parte Bird</u>, [Ms. 89-1061, Dec. 6, 1991], So.2d (Ala. 1991). See also <u>Insley v. State</u>, [Ms. 90-888, November 27, 1991] So.2d (Ala.Cr.App. 1991). In the present case, the trial court did not consider any of the allegation and continued to stand on the merits of jury selection was complied with correctly:

FINDINGS OF FACT

1.    The trial of this case was conducted in Mobile County Circuit Court. On the morning the jury was stricken, there were less than average jurors to select from because as the records show, the jury members were left over from the other courts where they were struck in those respective courtroom on the same day, and were limited as to which venire members present from which to strike.

2.    Of the State's strikes, all were white.

3.    A transcript of the hearing was taken in which the State of Alabama by its Deputy District Attorney, explained the reasons for the State's strikes rather than simply repeat in this petition the State's espoused reasons for each of its strikes, this Court should simply rely on the transcript for those underlying reasons. In summary, the State of Alabama's strikes were allegedly

based on information received during voir dire examination and/or by investigation the State conducted regarding potential jurors' previous connection with law enforcement or their family members connection with law enforcement or crime. Note that each and every member was a victim of one crime or another and there were no convictions or resolve. This would have an effect on a fair and impartial jury.

The reasons given for the State's strikes were:

(1)    General opposition to capital punishment.

(2)    Connection with law enforcement or criminal activity by the venire member or family member; or

(3)    A combination of reason 1 and 2.

## CONCLUSIONS

A.    The State of Alabama has given explanations for each peremptory strike it made of potential jurors that were white.

B.    This Court should visit the record, based on the decisions in Ex parte Branch and Batson v. Kentucky, and the line of cases decided by the Alabama Court of Criminal Appeals, and the Alabama Supreme Court following those decisions . . . the explanations given by the State of Alabama are insufficient and directly indicate race-ratio bias and limited to victims of a crime themselves with no positive resolve.

C.    This Court should see that the State of Alabama did use its peremptory challenges in a discriminatory manner and that there has been a gross violation of the Defendant's rights to equal protection under the 14th Amendment to the United States Constitution or his rights to a jury venire comprised of a fair cross-section of the community under the 6th Amendment to the United States

18

Constitution. This allegation is supported because the pages of the contaminated evidence used would invoke a reaction from a one-sided jury panel, without question.

Thereafter, the prosecutor gave her reasons for striking only the white potential jurors. While some of the reasons given by the prosecutor were clearly suspect, e.g., living in a high crime area, and subjective, e.g., making a poor impression during voir dire and failure to communicate, see Ex parte Bird, supra, the prosecutor also gave valid reasons for her strikes of the potential jurors, jurors for whom she had given the suspect or subjective reasons. See Davis v. State, 555 So.2d 309, 314 (Ala.Cr.App. 1989) (wherein the prosecutor gave a highly suspect reason, specifically age, for her strike the court should consider, "we do need to address whether this strike was a sham, however, since the prosecutor stated an additional ground for strike this venireman," The basic reasons given by the prosecutor for her strikes, as enunciated by the trial court have been held to be sufficiently race-bias. See, e.g., Gaston v. State, 581 So.2d 548 (Ala.Cr.App. 1991) (potential jurors properly struck pursuant to their connections with law enforcement); Fisher v. State, 587 So.2d 1027 (Ala.Cr.App. 1991), cert. denied, 587 So.2d 1039 (Ala. 1991) (potential juror struck where he indicated bias because the case involved capital punishment and stated that he was unsure whether he could set this bias aside).

The United States Supreme Court has recently addressed the appellate evaluations to be given this issue and emphasized the deference to be paid to the trial court's determination because this matter concerns a "pure issue of fact." Hernandez v. New York, U.S., 111 S.Ct. 1859 (1991). "A court addressing this issue must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact . . .'" Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection

19

Clause.  In this case, the jury panel was selected directly because the jury assembly all had been victims of crimes and the prosecutor improperly addressed this case as stemming from a "nasty divorce" which never was proven or supported by the indictment or the information prior to trial, to validate the use of such statement to jury prior to trial.  Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 264-265, 97 S.Ct. 555, 50 L.Ed. 2d 450 (1977); see also Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed. 2d 597 (1976).  "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker . . . selected . . . a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.  Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed. 2d 870 (1979) (footnote and citation omitted); see also McCleskey v. Kemp, 481 U.S. 278, 297-299, 107 S.Ct. 1756, 95 L.Ed. 2d 262 (1987).

"A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.  At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered should be deemed race-bias."

" . . . If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination."

". . . In Batson, we explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal. "In a recent Title VII sex discrimination case, we stated that "a finding of intentional discrimination is

a finding of fact" entitled to appropriate deference by a reviewing court. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed. 2d 518 (1985).   Since the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference., 470 U.S. 564 at 575-576.   Batson, supre, at 98, n. 21.

Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will 'largely turn on evaluation of credibility' 476 U.S., at 98, n. 21.   In the typical challenge inquiry, the decisive question will be whether counsel race-neutral explanation for a peremptory challenge should be believed.   There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.   As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lie 'peculiarly within a trial judge's province.'   Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).   Hernandez v. New York, U.S. at 111 S. Ct. 1859 at 1866-69.

Based on the reasons given by the prosecutor for her strike and on the great deference to be paid to the trial court's findings of fact on this matter, we would ask this court visit the prosecutor's peremptory challenges and determine if they were discriminatory.

The remaining issues raised by the appellant in this original appeal will be addressed hereafter.   The appellant argues that the trial court erred in failing to excuse for cause three potential jurors: a juror who was a victim of a violate crime, a juror whose wife had recently been robbed, and a juror who was acquainted with the state attorney.   The record indicates that a member of the venire

21

raised his hand when the prosecutor asked if anyone had ever heard of the appellant before and also when the prosecutor asked if anyone had ever heard of the appellant before, and also when asked if anyone had heard anything previously about the case. The Alabama Supreme Court has written the following: "The grounds on which a juror may be challenged for cause are set out in Code 1975, § 12-16-150. Additional grounds for challenge for cause under the common law still exist where they are not inconsistent with the statute. Kinder v. State, 515 So.2d 55, 60 (Ala.Crim.App. 1986). "In challenging a juror for cause, the test to be applied is that of probable prejudice. Alabama Power Co. V. Henderson, 342 So.2d 323, 327 (Ala.1976). While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. Id; Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1255-56 (Ala. 1986); Village Toyota Co. v. Stewart, 433 So.2d 1150, 1156 (Ala. 1983). This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. Id. A reversal is not appropriate absent abuse of discretion. In this case, the trial court directly abused its discretion. Alabama Power Co. V. Henderson, 342 So.2d at 327; Grandquest v. Williams, 273 Ala. 140, 135 So.2d 391 (1961); Mutual Bonding & Loan Ass'n v. Watson, 226 Ala. 526, 147 So. 817 (1933); Brown v. Woolverton, 219 Ala. 112, 115, 121 So. 404 (1928); see Clark v. State, 443 So.2d 1287 (Ala. Crim. App. 1983). "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231, (Ala.Crim.App. 1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 549 U.S. 836, 99 S.Ct. 120, 58 L.Ed. 2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280 (1955); Mahan v. State, 508 So.2d 1180 (Ala.Crim.App. 1986). This determination, again, is to be based on the juror's answers and demeanor and it is within

22

the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence. See Fordham v. State, 513 So.2d 31, 34-35 (Ala.Crim.App. 1986); Jarrell v. State, 355 So.2d 747, 749 (Ala.Crim.App. 1978)."

Ex parte Ellington, 580 So.2d 1367, 1368-69 (Ala. 1990), quoting Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989). Thus, while the statutory grounds for challenges of jurors for cause enumerated in § 12-16-150, Code of Alabama, 1975, are not all inclusive, there must be some ground that indicates probable prejudice in order to disqualify a prospective juror. Collins v. State, 385 So.2d 993, 999-1000 (Ala.Cr.App. 1979), reversed on other grounds, 385 So.2d 1005 (Ala. 1980). Where the ground is non-statutory, it must be "some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.), affirmed, 435 So.2d 151 (Ala. 1983). (wherein members or employees of the Mobile County School Board were not excludable for {621 So.2d 322} cause, although the indictment against the defendant charged that the meat was stolen from the Mobile County School Board).

In the present case, there is no statutory ground that would exclude a police officer who may have participated in the early investigations of the case. One of the statutory grounds - - "that he has an interest in the conviction or acquittal of the defendant" - - has often been used as a ground for challenge for cause where the prospective juror was a state or city employee or an employee of one of the parties to the action. See e.g., Shapiro v. City of Birmingham, 30 Ala. App. 563, 10 So.2d 38 (1942); Brackin v. State, 31 Ala. App. 228, 14 So.2d 383 (1943); Parsons v. State, 32 Ala. App. 266, 25 So.2d 44 (1946); McAdory v. State, 37 Ala. App. 349, 68 So.2d 68 (1953).

23

In the present case, the prosecutor stated that the initial investigation had to do with the 'nasty divorce' case and would be brought up at trial. The record indicates that evidence concerning this prior offense was admitted at trial. Moreover, this court has held that "prospective jurors who have heard of a defendant's previous conviction on th same charges need not be automatically excluded from the venire." [Citations omitted.] A prospective juror with knowledge of a previous conviction need not be dismissed for cause of the trial court determines that the jury does not have a fixed opinion of appellant's guilt, but rather can lay aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court." Beck v. State, 485 So.2d 1203, 1205 (Ala.Cr.App. 1984), affirmed, 485 So.2d 1207 (Ala. 1985). (Emphasis in original.)

The appellant argues that the trial court erred by allowing the prosecutor to introduce evidence of acts of physical abuse by the appellant, not charged in the indictment, in violation of the general exclusionary rule and of the appellant's rights to a fair trial, due process, and the presumption of innocence. The appellant argues that the statements concerning his alleged prior abuse of his wife and daughter were improper, being collateral suggestions that were admitted to show bad character. "While the general rule is that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character or an inclination or propensity to commit the type of crime for which the accused stands charged. The state may prove the accused commission of a previous crime if the evidence warrants a reasonable inference that he committed the now-charged offense for the purpose of conviction for the previous crime. Nelson v. State; C. Gamble, supra, at § 70.01(12)(e). Newsome v. State, 570 So.2d 703, at 716 (Ala.Cr.App. 1989). See also, Giddens v. State, 565 So.2d 1277, 1280-81 (Ala.Cr.App. 1990) (evidence that checks had been returned for insufficient funds was held

admissible pursuant to the motive exception to the exclusionary rule in a case charging the misappropriation of an employer's funds).

In the present case, these alleged prior bad acts by the appellant were in-admissible to show the appellant's motive in committing the now-charged offense. Therefore, as the evidence concerning these offenses was admitted solely for the purpose of showing the appellant's bad character, and the evidence was not relevant to the now-charged offense, thus the statements are in error by the trial court in allowing such statements in the presence of the jury with the intention that it would imply or construe that the petitioner was of bad character to commit the crime alleged in the indictment.

The petitioner argues that the trial court erred in denying, by operation of law, his motion for a new trial without a hearing, because, he says, he produced allegations of newly discovered evidence which, if reviewed, would have entitled him to a new trial. In the present case, the state presented in-sufficient evidence to support the petitioner's conviction, and there was error in the denial of the motion for a new trial.

Moreover, the fact that the petitioner's motion for a new trial was denied without a hearing, does constitute error and prejudice, because the trial court knew the petitioner was found guilty by improperly impaneled jury among other facts, as set out herein.

WHEREFORE, the foregoing considered, it is prayed that this Honorable Court set a hearing and order the same for review, to determine the relief that is just and protected under color of law and the Constitution.

Respectfully submitted,

RAY F. BALL #224928
3800 Fountain, Dorm 7-42
Atmore, AL 36503

STATE OF ALABAMA

COUNTY OF ESCAMBIA

    Before me, the undersigned Notary Public, in and for said State and County, personally appeared Ray Frank Ball, who is known to me, and who acknowledged before me that he has read the contents of the foregoing document and the statements made therein are true and correct to the best of his knowledge and belief, and he has executed the same voluntarily on the day the same bears date.

    Given under my hand and notarial seal on this the _13_ day of ___December___, 2006.

James E. Walker
Notary Public,

My commission expires: ___8-9-09___

26

1          Ms. Ball, would you come right up here,

2   please, ma'am?

3      (Witness sworn.)

4      THE COURT:  Please have a seat.

5      MS. POWELL: Your Honor, as the court is

6   aware, we're calling this witness as an adverse

7   witness and I would ask Your Honor to allow me to

8   ask her leading questions as such.

9      MS. FRANCEZ:  Judge, may I respond to that?

10     THE COURT:  Pardon?

11     MS. FRANCEZ: May I respond to that?

12     THE COURT:  Yes.

13     MS. FRANCEZ:  I believe that before they

14  could declare a hostile witness they would need to

15  establish that she is hostile other than just

16  saying she is adverse.

17     THE COURT:  Well, I was going to mention the

18  same thing. If there is a surprise or it appears

19  that she is adverse, I will certainly let you

20  treat her as adverse.  But actually she is not --

21  she's not a victim because there was nothing done

22  to this lady, even though there may have been

23  something.

24     So, I'm going to -- I'm going to allow you to

25  lead her in terms of preliminary matters.  And if

1    get started.

2         MR. BALL: Whatever you have to do, Your

3    Honor.

4         THE COURT:  Okay.

5         MR. BALL: Thank you.

6         THE COURT:  You're welcome.

7         MR. BALL:  Sir?

8         THE COURT: Yes, sir.

9         MR. BALL: One question.  Is it okay -- I am

10   going to be a witness, but is it okay for me to

11   sit here in jury selection?

12        THE COURT:  The rules are that something --

13   and I'm sure your son's lawyers have told you

14   this.  But the rules are when one side or the

15   other invokes what is called the rule, and it's

16   the rule of excluding potential witnesses in a

17   case -- I know it's my discretion. And because of

18   the nature of this trial, if either one of the

19   sides wish to have the rule invoked, even during

20   the voir dire of the jury, I would ask all

21   witnesses both from the State and the Defendant to

22   wait outside.  Otherwise, during the jury

23   selection process I don't have a problem with it.

24        Do y'all have --

25        MS. FRANCEZ:  The State is going to ask that

1    you invoke the rule.

2          MR. HUGHES: Okay. Judge, we would do it

3    from the opening arguments on. But I understand

4    that's their position.

5          THE COURT: Okay. Since it's the State's

6    position that they wish to have everyone excluded,

7    I am going to have to invoke the rule and ask you

8    to stay in the hallway. It was a reasonable

9    request.

10          MR. BALL: I appreciate it.

11          THE COURT: Thank you.

12          Bring in the jury.

13          (Prospective jurors present.)

14          THE COURT: All right. Do we have everybody

15    in? Is this the list?

16          THE CLERK: Yes, sir.

17          THE COURT: All right. You may be seated.

18          If any of you are potential witnesses in the

19    case, we have invoked the rule on the witnesses,

20    so you will need to step outside in the hallway.

21    Otherwise, obviously you are free to be in here.

22          Okay. Ladies and gentlemen, I was hoping to

23    say good morning, but I'm going to say good

24    afternoon. I know that many of you have already

25    been to some other courtrooms to go through what

1   is called the voir dire process in a jury

2   trial. It seems -- I think there is still one more

3   jury trial maybe to be selected today. I'm not

4   sure. Maybe we can let y'all go.

5          THE CLERK: Lockett has already got his.

6          THE COURT: He has got his?  Okay. So having

7   gone -- many of you, having gone through the voir

8   dire process, you know what we're getting ready to

9   do, and that's simply to try to select a jury that

10  best suits both parties in this case and feels

11  that can give this Defendant in this case a fair

12  and impartial trial and hearing.

13         All right. Today is a -- in this courtroom a

14  criminal case. As you have been -- as has been

15  explained to you, we have civil cases here and we

16  have criminal cases.  And this is a case wherein

17  an individual has been charged with a criminal

18  offense.  And fourteen of you will end up hearing

19  this case; twelve of you will end up deciding the

20  case.

21         Before I begin, I want to ask you once again,

22  if you would, stand and raise your right hand.

23         (Prospective jurors sworn.)

24         THE COURT:  Thank you.  Please be seated. As

25  I said, this is a criminal case.  And criminal

```
1    cases are generally brought, frankly, by way of
2    indictment from the Mobile County Grand Jury.   And
3    the indictment in this case was returned by the
4    April 8th, 2005 Grand Jury of Mobile County. Did
5    any of you serve on that grand jury?
6         (No response.)
7         THE COURT:  All right. Just because an
8    individual is indicted doesn't mean much of
9    anything.   It's simply a piece of paper on how we
10   all get to this courtroom here today. And I will
11   tell you that it is not evidence for nor against
12   the Defendant.  It's simply a manner or method in
13   which we advise the Defendant of the charges for
14   which he is going to face in the next day or two.
15   It's a piece of paper that I am going to read to
16   you in just a minute. And I want to make it clear.
17   Simply because somebody has been indicted doesn't
18   mean anything other than the fact that the grand
19   jury felt that it was a necessity that a jury be
20   held to determine his guilt or innocence. It also,
21   frankly, tells you, the jury, and me, as a judge,
22   what is required to be proved beyond a reasonable
23   doubt before a jury can return a verdict of guilty
24   in this case, a conviction.
25        Now, I want to read to you the indictment:
```

```
 1      The Grand Jury of said county charge that before

 2      the finding of this indictment, Ray Frank Ball,

 3      whose name is to the grand jury otherwise unknown

 4      than as stated, did, with the intent that a

 5      another person engage in conduct constituting the

 6      crime of murder, solicit, request, command or

 7      importune another person, to-wit:  Rodney Waldrop,

 8      to intentionally cause the death of Nicolina Ball

 9      by shooting her with a gun, in violation of

10      Section 13A-4-1 of the Code of Alabama against the

11      peace and dignity of the State of Alabama.  That

12      charges solicitation to commit murder.

13          Now, before we go any further, I am going to

14      have you identified.  And as you -- some of you

15      know by having served on juries or having gone

16      through this process, the reason that we're going

17      to do this is the parties in this case need to be

18      able to put a face with a name. And what I am

19      going to do is I am going to ask you to stand when

20      your name is called.  And when your name is --

21      we're going to start over here on the first row

22      against the wall, and we'll come across the first

23      row and then go back against the wall and come

24      across and do it until we finish.

25          When your name is called I want you to stand
```

1    and tell us where you are employed if you are

2    employed; if you are retired, please tell us where

3    you are retired -- from what company you retired

4    or what employment you had; tell us also if you

5    are married; and if you are married, what your

6    spouse's employment is; and, of course, if your

7    spouse is retired now, tell us where your spouse

8    used to work. If you are not married, of course,

9    tell us that you are single and not married.

10        I would also do -- want to do this. Please,

11    whenever a question either from the court or from

12    the lawyers is asked or directed to you as a panel

13    or you as an individual, if that occurs, I want

14    you to please stand and speak loudly.  And I will

15    tell you why. The acoustics in the courtroom are

16    not all that good. And the most important person

17    in the courtroom is seated to my right here in

18    front of me, Ms. Cagle, who is the court reporter.

19    We can't do anything without her.  She takes down

20    what everybody says in this courtroom.  And if she

21    can't hear you, then she is going to probably ask

22    you to speak up or stand up. So -- and I know

23    sometimes when you are asked a question you will

24    forget to stand up, but I will probably prompt you

25    by raising my hands as such. But when you speak,

1    please speak as loud as you feel necessary for us

2    to hear you at the front of the courtroom.

3         All right. Will the clerk call the names,

4    please?

5         (The clerk called the roll and the

6    prospective jurors complied with the order of the

7    court.)

8         THE COURT:  All right. Now, is any member of

9    this jury venire related -- Mr. Ball, would you

10   please stand, if you would?

11        (Defendant complies.)

12        THE COURT:  Is any member of the jury venire

13   related by blood or marriage to Ray Frank Ball?

14        (No response.)

15        THE COURT:  You may be seated, sir.

16        Are any of you acquainted with him or friends

17   of his in any way?

18        (No response.)

19        THE COURT:  Have any of you or any member of

20   your immediate family, to your knowledge, had any

21   business dealings or social contact with Mr. Ball?

22        (No response.)

23        THE COURT:  Ladies and gentlemen, the State

24   of Alabama in this proceeding will be represented

25   by Ms. Barbie Francez and Ms. JoBeth Murphree, and

```
 1        they are both standing. They represent the

 2        District Attorney's office.

 3             Y'all may be seated.  Thank you.

 4             As you know, the district attorney in Mobile

 5        County is Mr. John M. Tyson, Jr.

 6             Ms. Francez, would you go ahead and identify

 7        the members of the District Attorney's staff

 8        please?

 9             MS. FRANCEZ:  Yes, sir.

10             Mr. John Tyson, Jr., Nicki Patterson,

11        Stephanie Bea, John Furman, Nicole Giardina, Steve

12        Giardini, Lars Granade, Teresa Heinz, Adero

13        Marshall, Chris McDonough, Edmond Naman, Dave

14        Peacock, Jill Phillips, Alec Robinson, Ashley

15        Rich, Caroline Siderius, Martha Tierney, Deborah

16        Tillman, Greer Wilhelm and Jennifer Wright.

17             THE COURT:  Thank you, ma'am.

18             Now, in addition to Ms. Francez and Ms.

19        Murphree, you have heard the names of the other

20        attorneys and the district attorney in Mobile

21        County. Is there any member of this jury venire

22        who is related by blood or marriage to any of

23        those attorneys?

24             (No response.)

25             THE COURT:  Are any of you clients of theirs
```

```
1     or former clients of theirs?  Have any of these

2     lawyers ever done any legal work for you or a

3     member of your immediate family?

4          PROSPECTIVE JUROR: Yes.

5          THE COURT:  Could you please rise?  What is

6     your name, please?

7          PJ HAYES: My name is Marva Hayes.

8          THE COURT: Ms. Hayes.

9          PJ HAYES: I had occasion to be involved or

10    have services by Mr. Giardini.

11         THE COURT:  All right. Now, let me ask you

12    this question:  The fact that you were in some way

13    represented by Mr. Giardini, did it have to do

14    with a child?

15         PJ HAYES: Yes.

16         THE COURT:  Okay. The fact that Mr. Giardini

17    -- he represents the DA's office where children

18    are involved. The fact that he represented the

19    interest of the State where you and your child was

20    involved, would that fact in any way influence

21    you, and could you or would you give this

22    Defendant a fair and impartial hearing in this

23    case notwithstanding that relationship?

24         PJ HAYES: Yes, I believe so.

25         THE COURT:  You could give the Defendant a
```

1    fair trial?

2    PJ HAYES: Yes. I will be honest, if it

3    concerns a child, I don't think I could do it.

4    THE COURT: Okay. This case, as far as I

5    know -- I don't know many of the facts, if any,

6    frankly. But as far as I know, I don't think

7    there are any children involved in this case.

8    PJ HAYES: Then I could.

9    THE COURT: Okay. Thank you ma'am.

10    All right. Are any of you acquainted with,

11    personal friends with, social friends with any of

12    these attorneys in the DA's office?

13    (No response.)

14    THE COURT: Ms. Francez, who do you expect to

15    call as witnesses in this case?

16    MS. FRANCEZ: Judge, the State expects to

17    call Sergeant Mike Morgan, seated here to my

18    right, with the Mobile Police Department homicide

19    unit; Rodney Waldrop; Nicolina Ball; Charles

20    Hubbard; John Cruse.

21    THE COURT: Okay. You have heard the names

22    of the witnesses expected to be called by the

23    State or who may be called on behalf of the State

24    of Alabama. Is there any member of the jury

25    venire who is related by blood or marriage to any

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1    of those witnesses?

2         (No response.)

3         THE COURT:  Are any of you acquainted with

4    any of them, or friends of theirs, had any kind of

5    business dealings with them?

6         (No response.)

7         THE COURT:  The Defendant in this case, Ray

8    Frank Ball, is represented by Ms. Cindy Powell and

9    Mr. Greg Hughes. They are standing.

10        Y'all may be seated.

11        I will ask you:  Is anybody related by blood

12   or marriage to either one of those attorneys?

13        (No response.)

14        THE COURT:  Are any of you either clients or

15   former clients of theirs?  Have either one of

16   these lawyers ever done any legal work for you or

17   any member of your immediate family that you know

18   of?

19        (No response.)

20        THE COURT:  Are you acquainted with them,

21   social friends, had any kind of contact, business

22   contact with them that you know of?

23        (No response.)

24        THE COURT:  Now, I know Mr. Hughes is

25   basically a sole practitioner, but he is in an

1    office with other lawyers.

2        Would you identify those other officers

3    (sic)?

4        MR. HUGHES:  Yes, sir. As the judge said, I

5    am a sole practitioner.  But in the building we

6    have a group there:  Lee Hale, Sr.; Lee Hale, Jr.,

7    this young man right here; Raymond Pierson.  Have

8    to call roll. I think that's everybody.

9        THE COURT: Okay. And, Ms. Powell, I know you

10    are also a sole practitioner but your husband

11    practices law in Mobile County.  Would you

12    identify him and does he have any associates that

13    he works with?

14        MS. POWELL:  Yes, sir.

15        As the judge said, my name is Cindy Powell

16    and I am a solo practitioner. I do share office

17    space with James Harper and Stephen Terry, but we

18    all have our own solo practices.

19        My husband is Dennis Knizley.  He is also a

20    lawyer.  He has his own practice and he shares

21    space with John Williams, Jan Jones, Deborah

22    McGowin and Edward Smith. Those are the lawyers in

23    his office.

24        THE COURT:  Okay. Now, you have all heard all

25    of those attorneys.  Are any of you related by

1    blood or marriage to any of those attorneys?  Are

2    any of you close personal friends with, or

3    acquaintances of, or business associates of any of

4    those attorneys?

5         Yes, ma'am.  Rise and tell us your name.

6         PJ SCHNEIDER: Regina Schneider.

7         THE COURT:  All right.

8         PJ SCHNEIDER: I know Mr. Dennis Knizley.

9         THE COURT:  Okay. How do you know Mr.

10   Knizley?

11        PJ SCHNEIDER: I have met Mr. Knizley through

12   Delano Palughi.  He was a good family friend, and

13   that's how I know Mr. Knizley.

14        THE COURT:  Okay. And how did you know Judge

15   Palughi?

16        PJ SCHNEIDER: My mother and my Aunt Ellen

17   both worked for him.

18        THE COURT:  Okay. Now, the fact that you know

19   Mr. Knizley and you met Mr. Knizley through Judge

20   Palughi, would that fact and that fact alone

21   influence you in any way in rendering a fair and

22   impartial verdict in this case?

23        PJ SCHNEIDER:  No, sir.

24        THE COURT:  Could you give the Defendant and

25   the State of Alabama a fair trial?

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1      PJ SCHNEIDER: Yes, sir.

2      THE COURT:  Have any of those lawyers to your

3  knowledge -- are you clients of theirs or former

4  clients of theirs, or any of your immediate family

5  clients or former clients of theirs?

6      Yes, sir.  Please give us your name.

7      PJ LOWRY: Bobby Lowry.  Dennis Knizley

8  represented me in a divorce years ago.

9      THE COURT:  Okay. The fact that Mr. Knizley

10  represented you in a divorce, would that fact in

11  any way impair or affect your ability to render a

12  fair and impartial verdict?

13      PJ LOWRY: Yes, sir.

14      THE COURT:  It would?

15      PJ LOWERY: It wouldn't.

16      THE COURT:  It would not. Thank you, sir.

17      Okay. Either Ms. Powell or Mr. Hughes, do you

18  want me to qualify the jury as to any witnesses

19  you might call in this case?

20      MR. HUGHES:  Yes, sir. In addition to the

21  witnesses named off by the State, we may call some

22  or all of the following: Pamela Couey, Randy

23  McCall, Eric Wimpee, Laura Crutchfield, Jamie Lynn

24  Wimpee, Jerrod Howell, Bradley Allenbach, Cody

25  Mahan, Rodney -- you called him. Shawn Knott,

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1    Marla Knott Mitchum, Christy Grubb, Heather Bass,

2    Ray A. Ball, Carole Roberts.

3         THE COURT:  Okay.  You've heard the names of

4    the witnesses that may be called on behalf of the

5    Defense in this case.  Is there any member of the

6    jury venire who is related by blood or marriage to

7    any of those witnesses?

8         (No response.)

9         THE COURT:  Are any of you acquainted with

10   them, personal friends of theirs, have you had any

11   business dealings with any of those witnesses?

12        (No response.)

13        THE COURT:  Now, ladies and gentlemen, it is

14   the law of this state that this Defendant, Ray

15   Frank Ball, entered this courtroom presumed to be

16   innocent of the offense for which he is charged,

17   that is, solicitation to commit murder. The

18   presumption of innocence attends Ray Ball

19   throughout the trial unless or until the State of

20   Alabama proves his guilt beyond a reasonable

21   doubt, and that's the burden that the State of

22   Alabama carries in this and in every criminal

23   case, and that is to prove the guilt of Ray Ball

24   or this Defendant beyond a reasonable doubt.

25        If the State fails to meet that burden, then

1    your verdict as a juror must be one of not guilty,

2    an acquittal.

3        I further want to tell you that there is

4    absolutely no duty or responsibility or obligation

5    on the Defendant in this case or in any criminal

6    proceeding to present any evidence or to give any

7    testimony.

8        Do you - any of you - have any problems with

9    those concepts of our law?  And I will go through

10    them again.  First, the presumption of innocence;

11    second, the burden of proof beyond a reasonable

12    doubt being on the State of Alabama; and, last,

13    that there being no duty on this Defendant to

14    present any evidence or give any testimony.  Do

15    any of you have any problems with those concepts

16    of the law?

17        (No response.)

18    THE COURT:  I told you previously that an

19    indictment is not evidence for nor against the

20    Defendant.  It simply informs him of the nature of

21    the charge against him.

22        Is there any member of this jury venire who

23    believes that simply because a person has been

24    indicted that he is probably guilty of the offense

25    charged?

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

```
 1              (No response.)

 2         THE COURT:  Some persons, by reason of either

 3    maybe a religious, or philosophical, or moral

 4    belief, truly believe they cannot serve as a juror

 5    in a criminal case and sit in judgment of their

 6    fellow man.  Do any of you hold such a belief?

 7              (No response.)

 8         THE COURT:  One last question, and I want to

 9    you to think about it:  Do any of you know any

10    reason why you could not serve as a juror in this

11    case, listen to the testimony as it comes from the

12    witness stand, taking, of course, into

13    consideration any physical evidence, documents, or

14    photographs that may be introduced into evidence,

15    tape recordings and the like, listen to the law as

16    I give it to you at the conclusion of the

17    presentation of the evidence and return a fair and

18    impartial verdict based on the facts as you find

19    them as a jury and the law as I give it to you as

20    a judge at the conclusion of the trial?  Do any of

21    you know of any reason why you cannot do that?

22              (No response.)

23         THE COURT:  Ms. Francez, is there any voir

24    dire on behalf of the State?

25         MS. FRANCEZ:  Yes, sir.
```

```
 1          Good afternoon. The first thing I want to say
 2    to you and that I believe it's very important for
 3    you all to understand is that anything that I ask
 4    in no way am I trying to pry or dig into your
 5    personal life. Some of the questions in this case
 6    during voir dire will be personal. But I am not
 7    intending anything by that other than trying to
 8    get as much information about you all so that we
 9    can make decisions and so that we can give the
10    Defendant as well as the State a fair trial.
11          So I just hope that you don't take offense to
12    anything that I ask you.  And if you want to
13    reserve what you are saying, want to just let the
14    judge know afterwards, you can just say I would
15    prefer to talk with the judge and you will be
16    allowed to do so afterwards.
17          In this voir dire process and in the
18    selection of jury members it's very important that
19    you all speak up and give answers. And I know
20    sometimes that can be a little frightening or just
21    you're a little -- may be a little scared.  But as
22    long as you can give some answers and feel free to
23    raise your hand and say whatever you like and know
24    that there is no right or wrong answer, absolutely
25    not, it's just your opinion, the way you feel, the
```

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

```
 1          way you think about things, and then from then we

 2          can move on and pick a jury.

 3               One thing is that you are not to be concerned

 4          at all with the penalty or punishment.  When the

 5          judge issued you your oath -- and, again, if you

 6          are chosen as a juror, all that you are to

 7          consider is the guilt or innocence of the

 8          Defendant, Mr. Ball.

 9               Would that in any way -- and I will just ask

10          you:  Would that in any way cause you not to be

11          able to sit as a juror if you had to know the

12          penalty or punishment?  Could you put that aside

13          and just render a verdict of innocence or guilt?

14               (No response.)

15               MS. FRANCEZ:  Just raise your hand if that's

16          fine with you.

17               (Response.)

18               MS. FRANCEZ:  Okay.  Thank you. How many of

19          you have been a victim of a crime?  And it can be

20          any crime.  A victim of crime.

21               And I am just going to start down here. And

22          say your name, and what the crime -- what happened

23          to you. I think Mr. Hill.

24               PJ HILL: Yes.

25               MS. FRANCEZ: Okay.
```

1          PJ HILL: My car was stole --

2          MS. FRANCEZ: Uh-huh.

3          PJ HILL: -- last year.

4          MS. FRANCEZ: And did you report it to the

5     police?

6          PJ HILL: Yes, ma'am.

7          MS. FRANCEZ: Okay. Did they -- were they able

8     to recover that?

9          PJ HILL: Yes, ma'am.

10         MS. FRANCEZ: Okay. Did they find out who did

11    it?

12         PJ HILL: No.

13         MS. FRANCEZ: Because of that -- and this

14    question will apply to everyone.  So I won't --

15    you will know exactly what I am asking.

16         The fact that no one was prosecuted in a case

17    where your car was stolen, does that in any way --

18    do you hold anything against the District

19    Attorney's office, law enforcement, anything like

20    that?

21         PJ HILL: No, ma'am.

22         MS. FRANCEZ: Okay. Thank you.

23         Mr. Presnall?

24         PJ PRESNALL: Yes, ma'am. Theft of property.

25         MS. FRANCEZ: And, again, same thing: Did they

1  catch the person?

2      PJ PRESNALL: No, ma'am.

3      MS. FRANCEZ: Okay. Did you report it?

4      PJ PRESNALL: Yes, ma'am, I reported it. But,

5  no, I don't hold any grudge.

6      MS. FRANCEZ: Okay.  Thank you.

7      Anybody else on the front row? Second row?

8  Yes, sir.

9      PJ OSMON: Randy Osmon.

10     MS. FRANCEZ: Yes, sir.

11     PJ OSMON: Theft of property, windows broken

12  out on the vehicles, and so on.

13     MS. FRANCEZ: Is that on different occasions

14  or the same occasion?

15     PJ OSMON: Different occasions.

16     MS. FRANCEZ: All right. And, again, did you

17  report it to police?

18     PJ OSMON: Yes.

19     MS. FRANCEZ: Did they ever catch the person

20     --

21     PJ OSMON: No.

22     MS. FRANCEZ:  -- or persons?

23     And the same question:  Do you hold anything

24  against law enforcement, DA's office?

25     PJ OSMON: No.

1          MS. FRANCEZ: Thank you.

2          Anybody else on the second row?  Yes, ma'am?

3          PJ HAYES: Marva Hayes.  House burglarized.

4     There was no harm done. No one was caught.

5          MS. FRANCEZ: No one was caught.  Did you

6     report it to the police?

7          PJ HAYES: I do not hold anything against the

8     system.

9          MS. FRANCEZ: And I just have -- I will get to

10    the rest of you in just a moment.  Since I am with

11    you, Ms. Hayes, let me just ask you a question.

12    You said that you had a case where you were

13    involved working with Mr. Giardini.

14         PJ HAYES: Right.

15         MS. FRANCEZ: Was that a -- was that -- I am

16    going to say were you working with the State or

17    was this adverse to you?  Which side were you on?

18         PJ HAYES: With the State.

19         MS. FRANCEZ: The State.

20         PJ HAYES: Yes.

21         MS. FRANCEZ: Okay. And from that experience

22    do you hold any grudges from the DA's office on

23    that one, that experience?

24         PJ HAYES: No.

25         MS. FRANCEZ: Thank you. Anybody else in the

1    same row?  Yes, ma'am?

2         PJ SCHNEIDER:  My car windows were busted out

3    while it was sitting in front of my house.  No one

4    -- we didn't find out who did it; it wasn't even

5    reported.  And I was also raped and, no, it was

6    not reported.

7         THE COURT:  You are Ms. Schneider?

8         PJ SCHNEIDER: Yes.

9         THE COURT:  Thank you.

10        PJ SCHNEIDER: I am sorry.

11        MS. FRANCEZ: Anybody on the third row?  Yes,

12   sir?

13        PJ HUDSON: I had a truck stole.

14        MS. FRANCEZ: Your name?  I am sorry.

15        PJ HUDSON:  Gary Hudson.

16        MS. FRANCEZ: Okay, Mr. Hudson.  Your truck

17   was stolen?

18        PJ HUDSON: Yes.

19        MS. FRANCEZ: And did you report that to

20   police?

21        PJ HUDSON: I did.

22        MS. FRANCEZ: Did they ever find it?

23        PJ HUDSON: No.

24        MS. FRANCEZ: And the same question.

25        PJ HUDSON: No, I'm not mad at anybody.

1    MS. FRANCEZ: Okay. Anybody else on the row

2    with Mr. Hudson? Yes, sir.

3    PJ WASHINGTON: My car was stolen.

4    THE REPORTER: I need your name, please, sir.

5    PJ WASHINGTON: Teniro Washington.

6    THE REPORTER: Thank you, Mr. Washington.

7    PJ WASHINGTON:  And my house was burglarized.

8    MS. FRANCEZ: Okay. Did you report it to

9    police?

10   PJ WASHINGTON: Yes, ma'am.

11   MS. FRANCEZ: Did they ever find the person or

12   persons who did it?

13   PJ WASHINGTON: No, ma'am.

14   MS. FRANCEZ: And, again, are you mad at the

15   DA's office or police or anything?

16   PJ WASHINGTON: No, ma'am.

17   MS. FRANCEZ: Okay.  Thank you.

18   Anybody on the other side of Mr. Washington?

19   Yes, sir.  Mr. More?

20   PJ MORE: Car theft and same thing, house

21   burglary.

22   MS. FRANCEZ: Okay. Did they find the people?

23   PJ MORE:  Found the car but not the burglary.

24   THE REPORTER: I'm sorry?

25   PJ MORE: Found the car but not the burglary.

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1    MS. FRANCEZ: You got your car back? And do

2    you hold any grudge or do you feel bad about the

3    DA's office or law enforcement?

4    PJ MORE: No, ma'am.

5    MS. FRANCEZ: Thank you.

6    On the back row I believe.  Was there anyone?

7    Yes, sir.

8    PJ ARNOLD: John Arnold. Home burglarized.

9    MS. FRANCEZ: And the same question:  Did they

10    find the people?

11    PJ ARNOLD: No.

12    MS. FRANCEZ: And did you report it?

13    PJ ARNOLD: Yes.

14    MS. FRANCEZ: Okay. And are you upset with law

15    enforcement or the DA's office because --

16    PJ ARNOLD: No.

17    MS. FRANCEZ: -- nothing -- . Thank you.

18    Now, this one -- this one is tough.  This one

19    is a little personal here.  But, again, I don't

20    mean to be offensive at all, and you can certainly

21    tell -- raise your hand and tell us as a response

22    to this next question or you can tell the judge in

23    response to the question. Is there anybody here

24    who has been arrested, charged or convicted of

25    anything other than a traffic offense?  I'm not

1    talking about traffic offenses. Has anybody been

2    arrested, charged or convicted?

3         THE REPORTER: Barbie, there is one hand.

4         MS. FRANCEZ: Oh, okay.  Good group.

5         PROSPECTIVE JUROR:  I would like to speak

6    with the judge.

7         MS. FRANCEZ: With the judge.  Okay.  What's

8    your name, sir?

9         PJ CHANCEY: I am sorry. Don Chancey.

10        MS. FRANCEZ: Okay.

11        THE COURT: Come on up, Mr. Chancey.

12        (A bench conference was held with PJ Chancey

13   present, during which the following occurred:)

14        THE COURT:  Just let these lawyers get up

15   here so they can hear you.

16        PJ CHANCEY: Okay. I was convicted of a third

17   DUI and was incarcerated to work release in

18   Escambia County. I was there for six months.

19        THE COURT:  How long ago was that?

20        PJ CHANCEY: Ended January 1st this year. July

21   through January 1st.

22        THE COURT:  Would the fact that you have been

23   incarcerated for a DUI, would that affect or

24   impair your ability to give the State of Alabama

25   or the Defendant a fair and impartial trial and

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1    render a fair and impartial verdict?

2         PJ CHANCEY: I think I would have a hard time

3    because of the -- minority grouping in the

4    incarceration and some of the things I went

5    through.

6         THE COURT: Well, I understand it might -- you

7    might have a hard time.  I mean, I hear what you

8    are saying there. But what I am going to tell you

9    is: If you were selected to serve on this jury,

10   you are going to listen to the evidence and the

11   evidence alone against this man.  If you think the

12   evidence rises to the level of beyond a reasonable

13   doubt and other laws that I will give you, after

14   hearing all of that evidence, and I tell you that

15   the law is that you have got to give the man a

16   fair and impartial --

17        PJ CHANCEY: Right.

18        THE COURT:   -- and the State for that

19   matter, regardless of what may have happened to

20   you in prison.

21        PJ CHANCEY:  Uh-huh.

22        THE COURT:  If you can give me a little bit

23   more of a definitive answer rather than I know it

24   would be difficult.

25        Do you think you could  --

1    PJ CHANCEY:  Yeah, I think I can. I would

2    certainly give it my best effort.

3    THE COURT:  Well, I think that's all we can

4    ever ask --

5    PJ CHANCEY: Yeah.

6    THE COURT:  -- of anybody.

7    Would you like to ask him anything?

8    MS. FRANCEZ:  No, sir.

9    THE COURT:  Mr. Hughes?

10   MR. HUGHES: No, that's fine.

11   THE COURT:  Okay. Thank you.

12   MS. FRANCEZ: Judge, I believe there are a few

13   more who have not --.

14   (End of bench conference.)

15   MS. FRANCEZ:  And Ms. Ross, did you raise

16   your hand?  Okay. I'll tell you, if we can do

17   this, just if you go down the row so that we can

18   kind of keep in order.  If there is something that

19   you would like to tell the judge regarding an

20   arrest, conviction, or just a charge, if you want

21   to, you can do that.

22   I believe  --

23   PJ ROSS: It was carrying a pistol without a

24   permit.

25   MS. FRANCEZ: Is that you?

1        PJ ROSS:  Yes.

2        MS. FRANCEZ: Okay. And when did that occur?

3        PJ ROSS: Twenty-five years ago.

4        MS. FRANCEZ: Okay.  And the fact that you

5   were convicted, would you hold that against the

6   State of Alabama and the DA's office?  Could you

7   sit and listen to all the evidence fairly and

8   render a fair verdict?

9        PJ ROSS:  (Nods head affirmatively.)

10       MS. FRANCEZ: Okay.  Anyone else who would

11   like to either tell us or talk to the judge?

12       Yes, sir?

13       PJ LOWRY: I was arrested for spanking my

14   kids.  And it was right in the time when Dennis

15   Knizley was running for district attorney.  And I

16   was played as a tool between them to see which was

17   going to get a conviction.

18       MS. FRANCEZ: The fact that -- you were

19   actually arrested?  Were you charged?

20       PJ LOWRY: Yeah, I was arrested.

21       MS. FRANCEZ: Okay.  The fact that you were

22   arrested for that, would that keep you from, if

23   you were picked as a juror, to sit there and

24   listen to the evidence fairly and render a fair

25   verdict?

1    PJ LOWRY:  For this, yeah.  For something to

2    do with child abuse, no.  Because, like I said, I

3    was played as a tool for them to -- one was

4    running for district attorney and one was district

5    attorney.

6    MS. FRANCEZ:  Okay.  But you were talking

7    about children; correct?

8    PJ LOWRY: Right.

9    MS. FRANCEZ: Okay. And this case does not  --

10    PJ LOWRY: This wouldn't bother me, no.

11    MS. FRANCEZ:  -- involve children.  So you

12    could.

13    PJ LOWRY: Right.

14    MS. FRANCEZ: Okay.

15    THE COURT:  What is your name, sir?

16    PJ LOWRY: Bobby Lowry.

17    MS. FRANCEZ: How many of you here have heard

18    the term reasonable doubt?

19    (Response.)

20    MS. FRANCEZ:  How many of you here watch Law

21    & Order, CSI, all of those kind of shows?  Don't

22    miss a week.  Now we have, I think, CSI New York,

23    CSI Las Vegas, CSI Miami.  So I guess reasonable

24    doubt is a very common term.

25    The judge is going to give you a clearer

1    version of what the law is as to reasonable doubt.

2    And that's a doubt for which you have a reason.

3    It's really not that difficult. However, that is

4    the burden of the State.  We have to prove this

5    case against this Defendant beyond a reasonable

6    doubt.

7        Is there anyone here who feels like that the

8    burden on the State should be higher?  In other

9    words, that we should have to prove this case a

10    hundred percent or beyond all doubt?  And some

11    people feel that way.  And there  -- again, no

12    right or wrong answer.  If you feel that way, just

13    let us know.  Is there anybody here who feels like

14    the State should prove this case beyond all doubt?

15        (No response.)

16    MS. FRANCEZ:  In this case I do expect that

17    you are going to hear quite a bit of foul

18    language. Is there -- just about everything that

19    you can think of.

20        Is there anyone here who would be so offended

21    by that that they could not sit, if they're

22    selected as a juror, could not sit and listen to

23    that and to hear all of the other evidence and all

24    of that combined with the law as the judge

25    instructs you to come back with a fair and

1      impartial verdict?

2             (No response.)

3          MS. FRANCEZ:  Anybody here?

4             (No response.)

5          MS. FRANCEZ:  Now, when you all stood up, you

6      stated whether you were married or whether you

7      were single. How many of you are married

8      presently?

9             (Response.)

10          MS. FRANCEZ: Now, just keep your hand up for

11      one moment. Now, of all of you that are married

12      now, keep your hands up if this is a second or

13      third marriage, if you have been previously

14      divorced.

15             (Response.)

16          MS. FRANCEZ: Okay. Mr. Chancey, is -- so you

17      have been previously divorced?

18          PJ CHANCEY: That's correct.

19          MS. FRANCEZ: Mr. Arnold?

20          PJ ARNOLD: Yes.

21          MS. FRANCEZ: Previously divorced?

22          PJ ARNOLD: Yes.

23          MS. FRANCEZ:  I expect that --

24          THE REPORTER: You have another hand.  I think

25      you have another hand.

1          MS. FRANCEZ: Oh, I am sorry.  I'm sorry.

2          PJ HARRIS:  I'm sorry. Shannon Harris.

3          MS. FRANCEZ: Ms. Harris, you are a nurse; is

4     that right?

5          PJ HARRIS: Yes, ma'am.

6          MS. FRANCEZ: Previously married?

7          PJ HARRIS: (Nods head affirmatively.)

8          MS. FRANCEZ: As I was saying, I believe that

9     the testimony -- you will hear some evidence that

10    this was a very nasty divorce that the Defendant

11    and the victim in this case, the Defendant's wife,

12    were going through. Would the fact that any of you

13    have been either divorced or around either family

14    members or friends who have gone through a very

15    nasty divorce, would that in any way for any of

16    you cause you not to be able to sit and listen to

17    all of the evidence as presented and render a fair

18    verdict?

19         (No response.)

20         MS. FRANCEZ: How many of you are familiar

21    with -- when I say familiar, just drive down

22    Airport Boulevard and see a sign; I'm not asking

23    you anything else.  How many of you have seen the

24    sign or are aware of the shop called The Gift

25    Spot?  Have you ever seen that driving down

1    Airport Boulevard? It's located -- now it's

2    located on Airport and Cody.

3        PROSPECTIVE JUROR: What did you say?

4        MS. FRANCEZ: That it's a shop -- it's a store

5    called The Gift Spot.  Okay.

6        (Response.)

7        MS. FRANCEZ: And what I'm just going to ask

8    you, I won't go individually with you, but what I

9    am going to ask you is: The people who are -- and

10   I will just tell you, The Gift Spot is an adult

11   store. It is -- contains books and all kind of

12   other things of -- that you would have in an adult

13   book store.  And you are going to hear about that.

14   That was a business between the Defendant and his

15   wife.

16       The fact that a lot of the testimony you will

17   hear has to do with The Gift Spot, would that so

18   offend any of you that you would not be able to

19   sit and hear all of the evidence and render a fair

20   and an impartial verdict?

21       (No response.)

22       MS. FRANCEZ: Okay. Now, I'm not picking on

23   anyone, but I am going to ask a couple of

24   questions. Mr. Presnall -- no, I am sorry.  Mr.

25   Buzbee.  And if you don't want to answer it, let

1    me know.  Okay?

2        Now, I know -- this is not personal.  This is

3    just like a hypothetical question. Okay?  Not that

4    you would ever do this. If you were to hire

5    someone to kill your wife, who would you hire?

6        MR. HUGHES:   Your Honor, if it please the

7    court, I would object to this on voir dire.

8        THE COURT: I sustain the objection.  I'm not

9    sure where you are going with this, Ms. Francez.

10       MS. FRANCEZ: Well, just going to some of the

11   characters, wanting to see if they would be able

12   to sit and listen to the evidence based on some of

13   the witnesses that we're going to have. So I was

14   going to ask them.

15       THE COURT:  Well, I think maybe you can ask

16   that type of question.  But who he would hire as

17   -- to kill his wife, I'm not going to let him

18   answer that.

19       PROSPECTIVE JUROR: That's a bad question.

20       MS. FRANCEZ:  I understand that.  Thank you.

21   You can sit down. Thank you.

22       Okay.  Let me put it this way: There will

23   probably be a couple of people who will testify as

24   to the Defendant soliciting, requesting to have

25   his wife killed. And you might call them unsavory

1    characters. Now, the question would be:  Would

2    you, any of you, be incapable because of any

3    personal belief that you have, for any reason at

4    all, that you would not be able to sit and listen,

5    you would automatically discount that person

6    because of their background, their convictions?

7    It could be their lifestyle, it could be any of

8    those things.  But is there anybody here who would

9    automatically discount the testimony of -- well,

10   let me ask this:  Would anybody discount the

11   testimony of a person who committed murder?

12        (No response.)

13        MS. FRANCEZ:  Let me ask it another way  --

14   yes, sir.

15        PJ OSMON: I would have trouble -- I would not

16   expect that witness to be credible.

17        MS. FRANCEZ: Okay.

18        THE REPORTER: What's your name, please, sir?

19        PJ OSMON:  Randall Osmon.

20        MS. FRANCEZ: Mr. Osmon. Okay.

21        THE COURT:  Would you automatically disregard

22   everything that witness testified to, regardless

23   of the person's testimony, simply because that

24   person had been convicted or charged with murder?

25        PJ OSMON: No, I wouldn't say automatically.

1    It would depend on the question.

2        THE COURT:  You would test his credibility

3    because of that?

4        PJ OSMON: Correct.

5        THE COURT:  That is the law in Alabama, so

6    that's fine.  Thank you, sir.

7        MS. FRANCEZ:  I will just take it by rows.

8    Anybody on the first row who would automatically

9    discount the testimony of a witness who had

10    committed murder?

11        (No response.)

12        MS. FRANCEZ:  Anyone on the second row?

13        (No response.)

14        MS. FRANCEZ:  Third row?

15        (No response.)

16        MS. FRANCEZ: And the last row?

17        (No response.)

18        MS. FRANCEZ:  The judge is also going to

19    instruct you as to what solicitation is and what

20    it means - basically requesting someone to do

21    something for you.  The fact that the person did

22    not actually go through with it and commit the

23    crime, in this case it would be murder, the fact

24    that the crime wasn't completed, let's say, would

25    you not convict on solicitation because they

1    didn't do anything to try to kill her other than

2    get someone to do it?

3         (No response.)

4         MS. FRANCEZ:  Everybody understand that

5    question?  I know it was kind of jumbled up.

6         How many of you -- just raise your hand.  How

7    many of you would be able to sit and listen to the

8    evidence fairly and come back with a verdict of

9    guilty if the State proved its case beyond a

10   reasonable doubt that the Defendant solicited,

11   requested, sought out someone to kill his wife?

12   How many of you could render a verdict if we

13   proved our case beyond a reasonable doubt?

14        (Response.)

15        MS. FRANCEZ: Is there anyone here who could

16   not?

17        (No response.)

18        MS. FRANCEZ:  Is there anyone here who would

19   require that an additional step be taken, like

20   trying to shoot her, or strangle her, or do other

21   acts other than just request, seek, find someone

22   to do that? Is there anybody here who would

23   require the State to show something else besides

24   just requesting, seeking someone else to kill his

25   wife?

1          (No response.)

2          PJ HUDSON: Can I ask the judge  --

3          MS. FRANCEZ: Yes, sir.

4          THE REPORTER: I need your name.

5          PJ HUDSON:  You know the law.

6          THE COURT:  Tell us your name, sir.

7          PJ HUDSON:  I'm Gary Hudson.

8          THE COURT:  All right, Mr. Hudson.

9          PJ HUDSON: Now, is -- first of all, is there

10   a law against telling somebody I would like for

11   you to kill so-and-so?  I mean, I don't know that.

12          THE COURT:  I will tell you that the law in

13   the State of Alabama is that if you believe beyond

14   a reasonable doubt that someone intends to have

15   someone murdered and urges, requests, solicits and

16   I forget the other  --

17          MS. POWELL: Importunes.

18          MS. FRANCEZ: Importunes.

19          THE COURT:  -- importunes - and I will tell

20   you that importune means to urge or beg with

21   troublesome persistence - someone else to commit

22   that murder, that that is against the law in the

23   State of Alabama, even though nothing is done in

24   furtherance of that.

25          PJ HUDSON: Okay. I just wanted to know, you

1    know, that what we were trying to do was the law

2    here.

3         MS. FRANCEZ:  Let me follow up on what --

4    what you just said and the question you asked and

5    ask anybody here if you think that that should not

6    be a crime.  And that's okay if you believe that.

7         (No response.)

8         MS. FRANCEZ:  Anybody believe that should not

9    be a crime?

10         (No response.)

11         MS. FRANCEZ: And the judge asked you this,

12    and this is just a -- one last opportunity because

13    it is difficult to sit as a juror.  Is there any

14    reason why any of you -- and the reason I ask this

15    is because twelve of you will be sitting in that

16    box of fourteen with two alternates.  You will be

17    sitting in this jury box and you will be listening

18    to the evidence and coming back and rendering a

19    verdict. And I am going to stand up here again to

20    ask you to do that after you have heard the

21    evidence.

22         So with everything that has been said to this

23    point, is there anybody for any reason - any

24    reason - who could not sit and listen to the

25    evidence in this case and reach a fair verdict?

1          (No response.)

2          MS. FRANCEZ:  Thank you.

3          THE COURT:  Mr. Hughes.

4          MR. HUGHES:  I'll try not to go over

5     everything all over again.  As Barbie said, there

6     is no right answer or wrong answer to the

7     questions I am about to ask. All we want to know

8     is how you feel, what's in your mind.  We're

9     trying to get a jury that is fair, and that's what

10    -- this is at least one point where both sides

11    have kind of in common.  We want a jury that's

12    fair.  That's what we're looking for. We're not

13    trying to find somebody to line up and say, okay,

14    the Defense wins.  We're trying to find out where

15    you are coming from in your head with regard to

16    these charges. And, again, there is no right

17    answer or wrong answer.  Whatever you say is the

18    right answer. And all I want to know is how you

19    truly feel.

20         Barbie said that would any of you have a

21    problem finding Ray guilty here if they prove

22    their case beyond a reasonable doubt. And

23    everybody indicated that that wouldn't be a

24    problem.  And that's the way it should be.  If

25    they prove their case, then that's what you are

1    supposed to do.

2          But by the reverse of that, if they fail to

3    prove what they claim beyond a reasonable doubt,

4    are there any of you that would say, well, must be

5    -- must have done something, he was charged, and

6    I'm just not going to find him not guilty?  Does

7    anybody feel like that?

8          (No response.)

9    MR. HUGHES:  Now, some of you indicated that

10   you've been a victim of one sort of a crime or

11   another.  And I tried to write it all down here.

12   And Barbie asked would that affect or have any

13   impact on how you felt about the State.  And I

14   want to ask it the other way.  Because sometimes

15   people get -- have mishaps occur to them, victims

16   of various crimes, and it just leaves such a bad

17   taste in your mouth, you come down and you figure

18   well, everybody that's in there, you know, has

19   something to pay the State. And I just want to

20   make sure that the experiences that you have had

21   about being a victim of a crime don't impact on

22   this.

23          I think, Mr. Hill, you said you had your car

24   stolen.

25          PJ HILL:  Yes, sir.

1    MR. HUGHES: Would that experience in any way

2  make you more inclined to favor the State over the

3  Defendant if you were on this jury?

4    PJ HILL: No, sir.

5    MR. HUGHES: You would be able to give

6  everybody a fair trial?

7    PJ HILL: Yes, sir.

8    MR. HUGHES: Thank you, sir.

9    Mr. Presnall.

10    PJ PRESNALL: Yes, sir.

11    MR. HUGHES: With the experience that you had,

12  I think you had a theft also, would that in any

13  way, that experience, cause you to be more in line

14  with the State or more against a defendant?

15    PJ PRESNALL: No, sir.

16    MR. HUGHES:  Mr. Osmon. Again, you had a

17  theft and had some property damage. Would that

18  experience cause you to be -- line up more with

19  the State and against the Defendant in the trial?

20    PJ OSMON:  No, sir.

21    MR. HUGHES: You'd be able to listen to

22  everybody?

23    PJ OSMON:  Yes, sir.

24    MR. HUGHES:  Thank you, sir.

25    Ms. Hayes.

1    PJ HAYES:  Yes, sir.

2    MR. HUGHES:  Same thing.  You have been a

3    burglary victim.  Would that experience in any

4    fashion cause you to be more in line with the

5    State and in your mind saying I am on their team

6    because I've been victimized by somebody?

7    PJ HAYES:  No.

8    MR. HUGHES: You had told us about involvement

9    with Steve Giardini.  Would the fact that your --

10   I believe Barbie said you were on his side.  Would

11   the fact that you were involved when he was

12   helping you and you kind of had an alliance there

13   with the State, would that impact on your ability

14   to listen to this case and decide on Ray here's

15   case without any -- giving any weight to what

16   happened with that case with Mr. Giardini?

17   PJ HAYES:  No, it would not.

18   MR. HUGHES: Thank you, ma'am.

19   Ms. Schneider.  You had indicated you had

20   been a victim of a crime in the past.  Would that

21   experience in any way cause you to have any hard

22   feelings or be less willing to listen to this case

23   with an open mind as far as this Defendant goes?

24   PJ SCHNEIDER:  No, sir.

25   MR. HUGHES:  Okay. Mr. More, I believe

1   you've been a burglary victim.  And would that

2   experience cause you in any way to feel hard

3   towards the Defense in a criminal case?

4        PJ MORE: Not whatsoever.

5        MR. HUGHES:  Thank you, sir.

6        Mr. Arnold, I believe you have been a

7   burglary victim also.

8        PJ ARNOLD:  Right.

9        MR. HUGHES: Would that experience cause you

10  to have any hard feelings or be less willing to

11  listen to the Defense in a criminal case?

12       PJ ARNOLD:  No, sir.

13       MR. HUGHES: Thank you, sir.  Was there

14  anybody else who said they were a victim of a

15  crime? I'm trying to write all of these notes and

16  sometimes they are just not good. Yes, sir?

17       PJ HUDSON:  I had a truck stolen.

18       MR. HUGHES: Mr. Hudson?

19       PJ HUDSON: Hudson.

20       MR. HUGHES: Mr. Hudson, would that experience

21  in any way impact on your ability to listen to

22  this case and give Ray here a fair trial?

23       PJ HUDSON: No.

24       MR. HUGHES: Thank you, sir.

25       Yes, sir.  Mr. Washington?

```
1              PJ WASHINGTON: Washington. Burglary and car

2       theft.

3              MR. HUGHES: Okay. Would that have -- having

4       gone through that experience, would that affect

5       your ability to listen to this case and decide

6       this case on its own?

7              PJ WASHINGTON:  No.

8              MR. HUGHES:  Thank you, sir.

9              Anybody else that I missed?

10             (No response.)

11             MR. HUGHES:  Now, Ms. Francez asked you and I

12      -- maybe I didn't get the question right.  I think

13      my understanding, what I heard was have any of

14      your been arrested or charged with a criminal

15      offense and some people gave answers.  And I would

16      ask to expand that to family members.  Have any of

17      you had close family members who got arrested or

18      convicted of any criminal offense?

19             (Response.)

20             MR. HUGHES: And you can either tell me or

21      come up to the judge, whichever you would feel

22      more comfortable with.

23             (A bench conference was held with PJ Ross

24      present, during which the following occurred:)

25             THE COURT:  Come right up here, please, Ms.
```

1    Ross.

2         PJ ROSS: Helen Ross.

3         THE COURT:  Yes, ma'am.

4         PJ ROSS: I have a son that got convicted of a

5    crime.

6         THE COURT:  What was --

7         PJ ROSS: Drugs.

8         THE COURT:  A drug crime?  Was it --

9         PJ ROSS: He just got out of the penitentiary.

10        THE COURT: How long did he serve?

11        PJ ROSS:  Eight years.

12        THE COURT:  And was it a state charge?

13        PJ ROSS: Feds.

14        THE COURT:  Feds got him?

15        And would the fact that your son served eight

16    years for a conviction in federal court for a drug

17    violation, would that affect or impair your

18    ability to give the State of Alabama and this

19    Defendant a fair and impartial --

20        PJ ROSS: I don't think it would, but I would

21    rather not be here.

22        THE COURT:  Well, my guess is that there is

23    probably twenty-nine other people out there that

24    would rather not be here. But I know what you are

25    saying.  But really what I am trying to drive at

```
1       is if you tell me that the fact that your son

2       being convicted and serving time would somehow

3       affect or impair your ability to  --

4            PJ ROSS: No, it wouldn't.  He was guilty.

5       So --

6            THE COURT:  Okay. So you could give both

7       sides a fair trial?

8            PJ ROSS: Probably, yeah.

9            THE COURT:  Probably?

10            PJ ROSS: That's not what you want to hear.

11            THE COURT:  That's not what I want to hear. I

12       want to know whether you could or you couldn't.

13            PJ ROSS:  No.

14            THE COURT:  You could not.  You could not,

15       what, give a fair trial?

16            PJ ROSS: Yes, I could give a fair trial.

17            THE COURT:  Well, I thought you could.  You

18       look like the kind of lady that could give a fair

19       trial. You just don't want to be here; do you?

20            PJ ROSS: No.

21            THE COURT:  I understand. Why don't you want

22       to be here?

23            PJ ROSS: This is somebody's else life and I

24       just don't want to.

25            THE COURT:  It's difficult to sit --
```

1       PJ ROSS: It's very difficult.

2       THE COURT:  -- in judgment of somebody else;

3  isn't it?  I understand.  Well, even though it is

4  very difficult, would you listen to the facts as

5  they come from the witness stand and the law as I

6  give it to you and apply the facts and the law and

7  reach a fair verdict in this case even though you

8  know that your judgment is affecting somebody's

9  life?

10      PJ ROSS: Yeah, I probably could.

11      THE COURT:  Well, "probably" slipped in there

12  again on you.  Could you or could you not?

13      PJ ROSS: Yeah.

14      THE COURT:  I knew you could. You can have a

15  seat.

16      (End of bench conference.)

17      MR. HUGHES: This lady right here, do you want

18  to come up?

19      PJ STROTHER: I have a question.

20      MR. HUGHES: Yes, ma'am.

21      PJ STROTHER: Would that be immediate family

22  or distance (sic) relatives?

23      MR. HUGHES: If you have another family

24  member, I would certainly like to know about that

25  too.

1        PJ STROTHER: Distant or immediate?

2        MR. HUGHES: Either one.

3        PJ STROTHER: Okay.  Up there.

4        MR. HUGHES: You want to come up here?

5        PJ STROTHER: Uh-huh.

6        (A bench conference was held with PJ Strother

7    present, during which the following occurred:)

8        THE REPORTER: Tell me your name.

9        PJ STROTHER: Michelle Strother.

10       THE COURT:  Ms. Strother,  --

11       PJ STROTHER: Uh-huh.

12       THE COURT:   -- let's make sure we've got all

13   the lawyers. Do we need Ms. Powell?

14       Okay. What is it?

15       PJ STROTHER: They don't live here.  And I

16   think he lives, my mother's brother, in Wisconsin,

17   domestic violence; and then New York I think my

18   mom's nephew.

19       THE COURT:  And what was that for?

20       PJ STROTHER: I think theft.  I'm not sure.

21       THE COURT:  Were you close or did you know

22   them well?

23       PJ STROTHER: They live there and I lived

24   here, so we didn't see each other an awful lot

25   except when we were growing up.

```
 1          THE COURT:  The fact that your mother's

 2    brother and a nephew has been convicted of a

 3    criminal offense, would that in any way at all -

 4    any way at all - affect or impair your ability to

 5    give both of these parties a fair trial?

 6          PJ STROTHER: Not at all.

 7          THE COURT:  Good enough.

 8          PJ STROTHER:  Okay.

 9          THE COURT: Thank you, ma'am.

10          PJ STROTHER: Uh-huh.

11          (End of bench conference.)

12          THE COURT:  Is there anybody else who wants

13    to come up here?  If you do, why don't we just

14    make a line right here so we don't keep running

15    back and forth.  Might speed things up.

16          (A bench conference was held with PJ

17    Schneider present, during which the following

18    occurred:)

19          THE COURT:  Okay.  Ms. Schneider.

20          PJ SCHNEIDER: Yes, sir.

21          THE COURT:  Okay.

22          PJ SCHNEIDER: It was my little brother.

23          THE COURT:  Okay. What was wrong?

24          PJ SCHNEIDER: He got arrested for breaking

25    and entering into a vehicle belonging to a
```

```
 1          sheriff's department.

 2                THE COURT:  You know, we all have family

 3          members that make stupid mistakes; don't we?

 4                PJ SCHNEIDER: He did.  But he had a good

 5          attorney, got him off with probation and

 6          restitution.

 7                THE COURT:  Who represented him?

 8                PJ SCHNEIDER: Cherlina Monteiro.

 9                THE COURT:  Yes. She is a good lawyer.

10                PJ SCHNEIDER: Yes, she is.

11                THE COURT:  Okay. Now, the fact that your

12          little brother was -- broke into a car and was

13          arrested, and pled guilty it sounds like,  --

14                PJ SCHNEIDER: Yes, he did.

15                THE COURT:  -- would that fact and that fact

16          alone affect or impair your ability to give the

17          State --

18                PJ SCHNEIDER: No, sir.

19                THE COURT:  -- or the Defendant a fair  --

20                PJ SCHNEIDER: No, sir.  He done his -- what

21          he had to do to make up for what he had done.  So,

22          no, I have no problem.

23                THE COURT:  How old was he when he did that?

24                PJ SCHNEIDER: Eighteen.

25                THE COURT:  How old is he now?
```

1       PJ SCHNEIDER: Twenty-four. And he's married,

2   has a daughter, and is doing really good.

3       MR. HUGHES: That's fine.

4       THE COURT:  That's wonderful.  Okay. Thank

5   you, ma'am.

6       (PJ Schneider not present.)

7       (PJ Hayes present at the bench.)

8       PJ HAYES: My name is Marva Hayes.  My

9   son-in-law was indicted for murder but he was

10  acquitted, lack of evidence.  The same son-in-law

11  sexually molested his own child, my granddaughter,

12  and he did do time for that.

13      THE COURT:  Okay. And you are Ms. Hayes?

14      PJ HAYES: Hayes.

15      THE COURT: Okay. Now, this murder charge, who

16  was that -- who was he alleged to have murdered?

17      PJ HAYES:  I don't know her name. It's been a

18  couple of years ago.  First name was Linda. I

19  don't know  --

20      THE COURT:  Did he go to trial?

21      PJ HAYES: He did go to trial.

22      THE COURT:  And the jury found him not

23  guilty?

24      PJ HAYES: Correct.

25      THE COURT:  Did you have anything to do with

1    being a witness in that case or knowing anything

2    about that case?

3        PJ HAYES: (Shakes head negatively.)

4        THE COURT:  You will have to speak --

5        PJ HAYES:  No. I'm sorry.

6        THE COURT:  She's got to write it down.

7        PJ HAYES: No.

8        THE COURT:  Okay. Now, and it was your

9    daughter that --

10        PJ HAYES: My granddaughter.

11        THE COURT:  Your granddaughter that he was

12    convicted of molesting?

13        PJ HAYES: Correct. When she was five years

14    old.

15        THE COURT:  She was what?

16        PJ HAYES: Five years old.

17        THE COURT:  Well, all I can say is I am very

18    sorry to hear that.

19        Now, did he go to trial or --

20        PJ HAYES: Yes, --

21        THE COURT:  -- did he plead?

22        PJ HAYES: -- he did.

23        THE COURT:  And the jury found him guilty?

24        PJ HAYES: Yes.

25        THE COURT:  And the judge sentenced him?

1           PJ HAYES: Ten years.

2           THE COURT:  Okay. What judge was it; do you

3     remember?

4           PJ HAYES: I don't remember.

5           THE COURT:  What lawyer represented him?  Do

6     you remember that?

7           PJ HAYES: I think it was Madden.

8           THE COURT:  Arthur Madden?

9           PJ HAYES: Uh-huh.

10          THE COURT:  Okay. Now the fact that you have

11     experienced all of that, would that in any way,

12     and I am talking about in any way, would that in

13     any way affect your ability or impair your ability

14     to give the State and the Defendant a fair and

15     impartial hearing and trial in this case and

16     render a fair verdict?

17          PJ HAYES: No.

18          MS. FRANCEZ: May I ask just a question,

19     Judge?

20          In that case where your son-in-law was tried

21     for murder, do you remember who the prosecutor

22     was? Was that here in Mobile County?

23          PJ HAYES: It was here in Mobile.

24          MS. FRANCEZ: And do you remember -- the

25     reason I am saying this, I don't mean to embarrass

1    Ms. Murphree, but she does strictly mostly murder

2    cases.  Do you remember who the prosecutor was in

3    that case? If it was a female or a male, or  --

4         MS. MURPHREE: Or the defendant's name.

5         MS. FRANCEZ:  -- the defendant's name?

6         MS. MURPHREE: Your son-in-law.

7         MS. FRANCEZ: What's your son-in-law's name?

8         PJ HAYES: David Raider. I am sure you know of

9    it.

10        THE COURT: I mean, are you saying Ms.

11   Murphree was the prosecutor in the case?

12        MS. MURPHREE: No. I will say for the record I

13   know David Raider, he knows me.  I don't know if

14   you know me or not.

15        PJ HAYES:  He married my daughter.

16        THE COURT:  Would the fact that Ms. Murphree

17   knows your son --

18        PJ HAYES: Son-in-law.

19        THE COURT:  Is it son-in-law?

20        PJ HAYES: Son-in-law.

21        THE COURT:  Son-in-law and may have had --

22   may or may not have had anything to do with the

23   prosecution, would that in any way affect your

24   ability to give these parties a fair trial?

25        PJ HAYES: No, sir.

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

```
 1              THE COURT:  Okay. You wouldn't hold it

 2       against or for her that she had anything to do

 3       with that?

 4              PJ HAYES: No.

 5              MS. MURPHREE:  May I ask a question?

 6              THE COURT:  Sure.

 7              MS. MURPHREE:  Do you feel like David was

 8       treated fairly or unfairly by the system?

 9              PJ HAYES: My personal opinion?

10              MS. MURPHREE:  Yes, ma'am.

11              PJ HAYES: No.

12              MS. MURPHREE: You don't?

13              PJ HAYES: Well -- I am sorry.

14              MS. MURPHREE: No, go ahead.

15              PJ HAYES: By asking the question do you mean

16       that --

17              MS. MURPHREE: Do you think that he got a fair

18       shake?  In other words, do you think that he was

19       treated --

20              PJ HAYES: Yes.

21              MS. MURPHREE: -- fairly?

22              PJ HAYES: Yes, I do. More than fairly.

23              MS. MURPHREE:  You think he should have

24       gotten more than what he got?

25              PJ HAYES: In my opinion.
```

1          MS. MURPHREE:  Okay. That's all we're asking

2     is your opinion.

3          MR. HUGHES:  Ma'am -- can I --

4          THE COURT:  Sure.

5          MR. HUGHES: Ma'am, is this the same case that

6     Giardini was involved in?

7          PJ HAYES: With my child, yes -- grandchild.

8          MR. HUGHES: Okay. Thank you, ma'am.

9          THE COURT: All right. Thank you, ma'am.

10         (PJ Hayes not present.)

11         (PJ Chy present at the bench.)

12         PJ CHY: My name is Amanda Chy and my older

13    brother has been in jail and prison for 20 years.

14         THE COURT:  How many years?

15         PJ CHY: Twenty.

16         THE COURT:  Tell me your name again.

17         PJ CHY: Amanda Chy.

18         MR. HUGHES: Thirteen.

19         THE COURT:  Thirteen. Okay. I see. All right.

20    What was he in jail for?

21         PJ CHY: When he was 13 I think it was car

22    theft.

23         THE COURT:  He was 13 years old?

24         PJ CHY: Yeah. Car theft.  And what I

25    remember, in 1997 for drug abuse and selling

1    drugs.  And recently for identity theft for

2    stealing money out of my mom's account.

3         THE COURT:  Still a drug problem; right?

4         PJ CHY: Yeah. And attempted murder of his

5    wife, I hear. And he just got out of jail this

6    month.

7         THE COURT:  And that's your brother?

8         PJ CHY: Uh-huh.  I don't really talk to him

9    anymore.

10        THE COURT:  Okay. Let me ask you:  This case,

11   the allegations are that this gentlemen sitting

12   over here allegedly asked someone to have his wife

13   killed. The fact that you have a brother who

14   apparently -- was he convicted of attempted murder

15   of his wife?

16        PJ CHY: No, sir.

17        THE COURT:  He was charged with it. Was he

18   acquitted of it?

19        PJ CHY: No, sir.

20        THE COURT:  What happened to that charge?

21        PJ CHY: I think she -- I don't know.  She

22   dropped the charges.

23        THE COURT:  Okay. Now, I heard a lot of bad

24   things about your brother, what you just told me,

25   drugs, and breaking and entering, and taking money

```
 1        from your mamma. That's a family member of yours.

 2        But the fact that you have gone through all of

 3        that, experienced it and know about it, would that

 4        in any way affect or impair your ability to listen

 5        to the evidence in this case --

 6              PJ CHY: No, sir.

 7              THE COURT: -- listen to the law as I give it

 8        to you and give both of these parties a fair

 9        trial?

10              PJ CHY: Yes, sir.

11              THE COURT:  You could do that?

12              PJ CHY:  Yes, sir.

13              MS. FRANCEZ:  I just have one question,

14        Judge.

15              What's your brother's name?

16              PJ CHY: Seang Gah Tach.

17              MS. FRANCEZ: How do you spell that?

18              PJ CHY: S-E-A-N-G G-A-H T-A-C-H.

19              MS. FRANCEZ: And was that -- was he

20        prosecuted here in Mobile County?

21              PJ CHY: No. In California.

22              MS. FRANCEZ: California?

23              THE COURT:  Anything else?

24              MS. FRANCEZ:  No.

25              THE COURT:  Thank you, ma'am.
```

```
 1              (End of bench conference.)

 2         THE COURT:  I think that's it.

 3         MR. HUGHES: Have any of you had any sort of

 4    legal training, that is as a paralegal, worked in

 5    a law office, had courses or classes, or in

 6    anywise been involved in legal training?

 7         Ms. Schneider.

 8         PJ SCHNEIDER: Regina Schneider. I am a

 9    certified paralegal and a legal secretary.

10         MR. HUGHES: And what sort of legal work do

11    you do? Who do you work for?

12         PJ SCHNEIDER: Right now I don't work for

13    anyone. For the last three years I haven't worked

14    for anybody.

15         MR. HUGHES: Have you worked in criminal

16    defense or civil cases?

17         PJ SCHNEIDER: I have worked both, as well as

18    domestic.

19         MR. HUGHES: Okay. Thank you, ma'am.

20         MR. HUGHES:  Anybody else?

21         THE COURT: We've got somebody on the front

22    row.

23         PJ STROTHER: I just have  --

24         THE COURT:  Could you stand, please, and give

25    us  --
```

1          PJ STROTHER:  I just have a question.  I

2     wanted to know does that include being a notary

3     and taking, like, law classes?

4          MR. HUGHES: Law classes are good.

5          PJ STROTHER:  Okay. I have taken employment

6     law and educational law, and I am a notary.

7          MR. HUGHES: Give me your name one more time.

8          PJ STROTHER: Michelle Strother.

9          MR. HUGHES: Okay.  Thank you, ma'am.

10         Anybody else?  Yes, sir, Mr. Lowry.

11         PJ LOWRY: Bobby Lowry. I don't need to come

12    up there, but I have got a brother that was

13    convicted of state-to-state drug trafficking.

14         I didn't know if you wanted to skip that

15    over.

16         MR. HUGHES:  No, sir.  That's fine. I

17    appreciate you speaking up.  Would that experience

18    --

19         PJ LOWRY: No. No.

20         MR. HUGHES: -- affect you at all?

21         PJ LOWRY: No.

22         MR. HUGHES: One way or the other?

23         PJ LOWRY: No. He did it, he deserved it.

24         MR. HUGHES: Okay.  Thank you, sir.

25    Appreciate your speaking up.

1        Now, have any of you or any of your family

2   members or close personal friends been involved in

3   any form of law enforcement?  And by this I mean

4   policeman, deputy sheriff, state trooper, prison

5   guard, MP, private security guard, any sort of law

6   enforcement.

7        We have a number.  Let's start on the front

8   row, I guess.

9        And, Ms. Strother, you are the first one.

10        PJ STROTHER: Yes, my stepmother is a

11   supervisor with the City of Prichard Police

12   Department, and then I have couple of friends that

13   are in law enforcement.

14        MR. HUGHES: Okay. Now, your stepmother is a

15   supervisor did you say?

16        PJ STROTHER: Uh-huh.

17        MR. HUGHES: With Prichard?

18        PJ STROTHER: Uh-huh.

19        MR. HUGHES: And what's her name?

20        PJ STROTHER: Dorothy Strother.

21        MR. HUGHES: Oh, okay. And you had some

22   friends, I believe you said?

23        PJ STROTHER: Uh-huh.

24        MR. HUGHES: Who would that be?

25        PJ STROTHER: Some -- a couple of my sorority

```
 1      sisters.

 2          MR. HUGHES: And how are they involved in law

 3      enforcement?

 4          PJ STROTHER: One, I think she works for the

 5      DA's office, I think.

 6          MR. HUGHES: Here?

 7          PJ STROTHER: Uh-huh.

 8          MR. HUGHES: And what's her name?

 9          PJ STROTHER: Lenora.  I forget her last name.

10      But her name is Lenora.

11          MR. HUGHES: Does she work in the DA's office,

12      your understanding?

13          PJ STROTHER: No, she usually works out in the

14      field.

15          MS. FRANCEZ: Lenora Timmons is a investigator

16      with the -- with our office.

17          MR. HUGHES: And she is a sorority sister?

18          PJ STROTHER: Uh-huh.

19          MR. HUGHES: And how often do you see her?

20          PJ STROTHER: Once or twice a month probably.

21          MR. HUGHES: And you had another friend that

22      was --

23          PJ STROTHER: And the rest of them were people

24      I might know that I went to high school with that

25      are police officers.
```

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1         MR. HUGHES: Do you see them very often?

2         PJ STROTHER: Every now and then, every three

3  or four months probably.

4         MR. HUGHES: Okay. Would your connection with

5  law enforcement folks that you talked about here,

6  sorority sisters, your stepmother, or any of those

7  other people you have told us about, would that

8  impact on your ability to decide this case?

9         PJ STROTHER: No.

10        MR. HUGHES: Would you feel bad if, say, the

11  State and Ms. Francez here, they didn't prove

12  their case and you found Ray not guilty, would

13  that make you feel bad to go back and tell your

14  stepmamma they just didn't prove it and I found

15  them not guilty?

16        PJ STROTHER: No.

17        MR. HUGHES: You would be able to do that?

18        PJ STROTHER: I would be able to do it.

19        MR. HUGHES: Thank you.

20        Anybody else on the first row? Yes, sir.

21        PJ BUZBEE: Friends?

22        MR. HUGHES: Close friends.

23        PJ BUZBEE: Edwin Buzbee.

24        MR. HUGHES: Yes, sir.

25        PJ BUZBEE: I have got two friends. One of

1    them -- both of them is off now.  One is retired,

2    Pete Holifield.  Another one was Tommy Pettis.  He

3    is out now. And I do have one named Mike Shavers

4    that I see every now and then.

5        MR. HUGHES: And these friends, would your

6    connection with them impact on your ability to

7    decide this case?

8        PJ BUZBEE: No.

9        MR. HUGHES: You could do it without --

10        PJ BUZBEE: Yeah.

11        MR. HUGHES: -- without regard to them and

12    whatever they thought about it?

13        PJ BUZBEE:  Right.

14        MR. HUGHES: Thank you, sir.

15        Next row. All right. Start on the corner.

16    Yes, ma'am.

17        PJ COLLEY:  Artelius Colley. I have a nephew,

18    Keith Turner.

19        MR. HUGHES: What does he do?

20        PJ COLLEY: Works for the jailhouse.

21        MR. HUGHES: Is he a correctional officer over

22    there?

23        PJ COLLEY: Yes.  Correctional officer.

24        MR. HUGHES: And would that connection with

25    law enforcement, would that have any impact on

1          your ability to decide this case?

2              PJ COLLEY: No, sir.

3              MR. HUGHES: Do you ever talk to him about

4      people in the jail, what's going on over there?

5              PJ COLLEY: No, we don't.

6              MR. HUGHES: Thank you, ma'am.

7              Front row.

8              PJ DAVIDSON: I have a cousin that's a

9      corrections officer.

10             MR. HUGHES: All right. And what's your name?

11             PJ DAVIDSON: Chante Davidson.

12             THE COURT:  Is he a corrections officer in

13     Mobile?

14             PJ DAVIDSON: Uh-huh.

15             MR. HUGHES: And would that connection hinder

16     you in making a decision in this case?

17             PJ DAVIDSON: No, sir.

18             MR. HUGHES: Do you ever talk with that cousin

19     about prisoners or inmates, or whatever goes on

20     over there?

21             PJ DAVIDSON:  No.  I only see him maybe once

22     or twice a year.

23             MR. HUGHES: Thank you, ma'am.

24             Next one.  Yes, sir?

25             PJ MEDICUS: John Medicus. My oldest son just

```
 1    started the police training academy in Tuscaloosa

 2    for the City of Hoover.

 3         MR. HUGHES: In that connection with your son

 4    starting off in the police business, would that

 5    impact on your ability to decide this case?

 6         PJ MEDICUS: No, sir.

 7         MR. HUGHES: Thank you, sir.

 8         Coming down.  Ms. Schneider.

 9         PJ SCHNEIDER:  Yes. Ms. Schneider.  I have

10    two friends that are police officers for the City

11    of Mobile.  One's name is -- well, I just forgot.

12    Nick.  Don't ask me what his last name is, I can't

13    remember.

14         MR. HUGHES: Happens to me too.

15         PJ SCHNEIDER: And the other one is Doug

16    Parmeter.  Yes. And my mother is a bailiff here in

17    the courthouse.

18         MR. HUGHES: And who is she a bailiff for?

19         PJ SCHNEIDER: Judge Hardesty's courtroom.

20         MR. HUGHES: Okay. And would those connections

21    interfere with your ability to decide this case

22    just on what you hear here without regard to what

23    your law enforcement friends might say?

24         PJ SCHNEIDER: No, sir.

25         MR. HUGHES: All right. Thank you.
```

1            Next row. Mr. Hudson.

2            PJ HUDSON: I own a security business.

3            MR. HUGHES: And you say security. Is it

4       like patrol, or --

5            PJ HUDSON: We do home security, cameras,

6       surveillance.

7            MR. HUGHES: Doesn't involve you going out and

8       patrolling or anything like that?

9            PJ HUDSON: No, I don't patrol.

10           MR. HUGHES: Being in that line of work, would

11      that cause you any problem or hinder your ability

12      to decide this case?

13           PJ HUDSON: No.

14           MR. HUGHES: Thank you, sir.

15           Next, coming this way. Okay.

16           PJ CHAMBLIN:  Chamblin.

17           MR. HUGHES: Yes, sir.

18           PJ CHAMBLIN: I was a police officer in the

19      State of Oklahoma for six years. Also a

20      firefighter, rescue squad.  That entailed working

21      hand in hand with law enforcement in Oklahoma.

22           MR. HUGHES: And you are Mr. --

23           PJ CHAMBLIN: Last name is Chamblin.

24           MR. HUGHES: Okay. I had it right.

25           PJ CHAMBLIN: Yes, sir.

```
1              MR. HUGHES: Thank you, sir.

2         Let me ask you:  With that involvement, would

3    that interfere with your ability to decide this

4    case on just what you hear in here?

5              PJ CHAMBLIN: Absolutely not.

6              MR. HUGHES: Thank you, sir.

7         Next row.  I think we have somebody on the

8    next row. Yes, ma'am.

9              PJ THOMPSON: There are actually two police

10   officers that are actually just friends.

11             MR. HUGHES: Okay. What's your name again?

12             PJ THOMPSON: Anitra Thompson.

13             MR. HUGHES: Okay.  And who would -- who would

14   that be?

15             PJ THOMPSON: One is John Kelly, I went to

16   high school with him; and the other one is Paul

17   Smitherman.

18             MR. HUGHES: I'm sorry. Paul?

19             PJ THOMPSON: Paul Smitherman.

20             MR. HUGHES: Smitherman?

21             PJ THOMPSON:  Uh-huh.

22             MR. HUGHES: And as I asked the other folks:

23   Would that connection hinder your ability to

24   decide this case just on that?

25             PJ THOMPSON: No, sir.
```

1          MR. HUGHES: And if you found Ray not guilty,

2    you wouldn't have any problems telling your

3    buddies or your friends I found somebody not

4    guilty?

5          PJ THOMPSON: No, sir.

6          MR. HUGHES: Thank you.

7          Anybody else?  Yes, sir.

8          PJ ARNOLD: John Arnold.

9          MR. HUGHES: Yes, sir.

10          PJ ARNOLD: I have a cousin, Curtis Robinson,

11    who is a sergeant with Mobile Police Department. I

12    have several friends who work for the sheriff's

13    department.

14          MR. HUGHES:  And do you see these folks

15    often?

16          PJ ARNOLD: Ever so often. I haven't seen them

17    in a while yet.  I've been working twelve hours

18    day seven days a week.

19          MR. HUGHES: Good job. Would that connection

20    interfere with your ability to decide this case?

21          PJ ARNOLD: No.

22          MR. HUGHES: Thank you, sir.  Appreciate it.

23          Is that everybody on that question?

24          Okay. Some of you said you have got friends

25    or family that are law enforcement officers. Are

1    there any of you that would believe a law

2    enforcement officer over a lay witness just

3    because it's a law enforcement officer, just

4    because he is a police officer or a deputy sheriff

5    or whatever?  Would any of you believe them more

6    than somebody else just because of their position?

7         (No response.)

8         MR. HUGHES:   Okay. Have any of you ever

9    served as a juror on a criminal jury trial?

10   That's like the State of Alabama versus somebody

11   charged with a crime; not Joe Blow and Mary having

12   a car wreck or something.

13        All right. Let's start on this end. Yes,

14   ma'am. I believe you're the first one. On a jury?

15   Yes, ma'am.  Your name again.

16        PJ DAVIDSON: Chante Davidson.

17        MR. HUGHES: One more time.

18        PJ DAVIDSON: Chante Davidson.

19        MR. HUGHES: Okay. And tell me what -- how

20   many times and where you served.

21        PJ DAVIDSON: It was my first.  This is

22   actually my second time to be in a murder trial.

23        MR. HUGHES: First time was a murder trial?

24        PJ DAVIDSON: Uh-huh.

25        MR. HUGHES:  Where was that?

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1          PJ DAVIDSON: Here.

2          MR. HUGHES: How long ago was that?

3          PJ DAVIDSON: Maybe a year, --

4          THE REPORTER: I'm sorry, but I can't hear

5     you.

6          PJ DAVIDSON: Maybe a year and a half.

7          THE REPORTER: Thank you.

8          MR. HUGHES: And were y'all able to reach a

9     verdict in that case?

10          PJ DAVIDSON: Yes.

11          MR. HUGHES: What was it?

12          PJ DAVIDSON:  Manslaughter.

13          MR. HUGHES: Ma'am, with that experience --

14     most people when they go through something they

15     carry some of it with them.  Just human nature.

16     Would you be able to decide this case solely on

17     the evidence you hear in here without bringing

18     whatever you thought the facts were or whatever

19     you thought the law was or anything about that

20     other case, just come in here with a clean slate

21     and start over?

22          PJ DAVIDSON: Yes, sir.

23          MR. HUGHES: You would be able to do that?

24          PJ DAVIDSON: Yes, sir.

25          MR. HUGHES: Thank you.

1          Yes, sir. Mr. Buzbee.

2          PJ BUZBEE: I served -- Edwin Buzbee.  I

3    served on a jury in Louisiana.  It was a robbery

4    case.

5          MR. HUGHES: Okay. And did they reach a

6    verdict?

7          PJ BUZBEE: Yes.

8          MR. HUGHES: And what was that?

9          PJ BUZBEE: Guilty.

10         MR. HUGHES: And like I asked this other lady:

11   Would you be able to put aside whatever went on in

12   that case and just come in here with a clean

13   slate?

14         PJ BUZBEE: That was back in 1984, so it's

15   going back.

16         MR. HUGHES: Thank you. Anybody else from this

17   row?

18         Okay. Go to the next row.  Anybody on the

19   second row that's been on a criminal trial jury?

20         (No response.)

21         MR. HUGHES: Third row?  Anybody?  Yes, sir.

22         PJ TURNER: Ben Turner. I was on one.  I don't

23   know how many years ago.  Old courthouse.  Fifteen

24   probably.  Murder case.

25         MR. HUGHES: Were you able to reach a verdict?

```
 1              PJ TURNER: Not guilty.

 2              MR. HUGHES: Would you be able to decide this

 3         case just on whatever you heard in here without

 4         regard to whatever happened back then?

 5              PJ TURNER: Yes, sir.

 6              MR. HUGHES: Thank you so much.

 7              Anybody else?

 8              And any -- and when I say that, has anybody

 9         been on a federal criminal jury trial?

10              (No response.)

11              MR. HUGHES:  Have any of you served on a

12         grand jury, either state or federal?

13              All right.  I guess that's the only two.

14              Mr. Turner, was it a state or federal grand

15         jury?

16              PJ TURNER: State.

17              MR. HUGHES: All right. And the lady next to

18         you.

19              PJ SASSER: I'm Pat Sasser. I served on a

20         federal.

21              MR. HUGHES: And anybody else?  Yes, sir, Mr.

22         Arnold.

23              PJ ARNOLD: I served on a federal

24         discrimination case.

25              MR. HUGHES: Okay.  Have any of you that
```

1    served on a grand jury or a trial jury, were any

2    of you a foreman or a foreperson?

3        Mr. Turner, you were a foreman. And grand

4    jury or the trial jury?

5        PJ TURNER: Trial jury.

6        MR. HUGHES:  Thank you, sir.

7        Anybody else?

8        Have any of you testified as a witness for

9    the prosecution in any state or federal trial?

10   That is, you were called as a witness by either

11   the government, that's in federal court, or the

12   DA's office that's in state court?

13       (No response.)

14       MR. HUGHES: I expect it's going to come out

15   in the evidence that Ray Ball is presently

16   incarcerated on some charges other than these.

17   Would the fact that he is presently incarcerated

18   on something unrelated to this, would that prevent

19   you - just that fact - prevent you from hearing

20   what he has got to say and ruling on this case?

21   Would you all be able to listen to what's in this

22   case?

23       (No response.)

24       MR. HUGHES: Thank you. Now, in the past Ray

25   Ball has been convicted for receiving stolen

1    property.  Would that in anywise prevent you from

2    listening to this evidence and deciding this case

3    on these facts?

4         (No response.)

5         MR. HUGHES: Thank you again.

6         Ray Ball is -- presently he is incarcerated

7    for a drug possession charge and violating some

8    anti-obsenity laws which involved some naked

9    dancing girls.

10        Would those facts prevent you from giving him

11   a fair trial on this case?

12        (No response.)

13        MR. HUGHES: Would you be able to listen to

14   him and hear what he had to say, listen to his

15   side?  Anybody have a problem with that?

16        (No response.)

17        MR. HUGHES:  Are there any of you -- the

18   judge told you before that the Defendant in this

19   case, Ray Ball, comes to court presumed innocent.

20   That's a presumption, but that's the law; that a

21   person charged with a criminal offense is presumed

22   innocent when they come in here and remain with

23   that presumption until or unless the State can

24   prove beyond a reasonable doubt his guilt.

25        The question is: Are there any of you,

1    knowing what I have told you about Ray Ball, any

2    of you who could not afford him this presumption

3    of innocence as we start off this case?

4         (No response.)

5         MR. HUGHES:  And just to make sure we're all

6    -- that I am understanding it anyway, Barbie asked

7    before if any of y'all are familiar with The Gift

8    Spot.  And is there anybody that didn't already

9    indicate they were familiar with it?  Anybody else

10   that has thought about it and said, oh, yeah, I

11   remember that now?  If you've already answered, I

12   know that.

13        (No response.)

14        MR. HUGHES:  Have any of you, your family, or

15   close personal friends been the victim of domestic

16   violence?

17        If y'all want to come up again and come up

18   and talk to the judge, or whatever makes you feel

19   more comfortable.  We need to hear from you, but

20   if you want to come up here, I think that would be

21   fine, if you would rather.

22        Judge, could we get them to line up again?

23        THE COURT:  Sure.

24        MR. HUGHES:  Save time.

25        (A bench conference was held with PJ Ross

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1       present, during which the following occurred:)

2            THE COURT:  All right. Ms. Ross.

3            PJ ROSS:  Domestic violence.

4            THE COURT:  Your husband or  --

5            PJ ROSS: Husband. My husband is on appeal

6       right now as we speak.

7            THE COURT:  He's on appeal now? Did he beat

8       you up, or what happened?  Can you give me an

9       idea?

10            PJ ROSS: Harassment.  I think that's what

11       they got him for.

12            THE COURT:  Got him for harassment.

13            PJ ROSS: It was assault and they dropped it

14       to harassment and he appealed.

15            THE COURT:  Okay.  So in lower court he has

16       appealed it to circuit court.

17            PJ ROSS: Yes.  Supposed to be in court on the

18       1st.

19            THE COURT:  All right. And you're the victim

20       in that case.

21            PJ ROSS: Yeah, but I didn't testify.  So.

22            THE COURT:  Okay.  Do you plan on testifying?

23            PJ ROSS: No.

24            THE COURT:  Does he -- do you and he still

25       live together?

1          PJ ROSS: Yes.

2          THE COURT:  The fact that he has been

3    arrested by law enforcement for domestic violence

4    and you are not going to testify, would that in

5    any way affect your ability in this case --

6          PJ ROSS: No.

7          THE COURT:  -- to render a fair verdict?

8          PJ ROSS:  No.

9          THE COURT:  Any questions?

10         MR. HUGHES:   No.

11         MS. MURPHREE:  No.

12         THE COURT:  All right. You may be seated.

13   Thank you, ma'am.

14         (PJ Ross not present.)

15         (PJ Davidson present at the bench.)

16         THE COURT:   Come on up, please, ma'am.

17         PJ DAVIDSON: Chante Davidson.

18         THE COURT: Okay.  Ms. Davidson.

19         PJ DAVIDSON: I had an aunt that was killed by

20   her husband years ago.

21         THE COURT:  You had a what?

22         PJ DAVIDSON: An aunt.

23         THE COURT:  That was killed by her husband?

24         PJ DAVIDSON: Right.

25         THE COURT:  The fact that -- did you know --

1       I mean, were you close to your aunt?

2            PJ DAVIDSON:  I was small.

3            THE COURT:  You were little? I was going to

4       say you look young.

5            PJ DAVIDSON: I was small, probably about

6       three, four.

7            THE COURT:  The fact that that occurred and

8       you know something about it, would that affect

9       your ability to give these parties a fair trial?

10           PJ DAVIDSON: No.

11           MS. FRANCEZ:  I have just a couple of

12      questions.  It was your aunt?  And she was -- you

13      said she was killed.

14           PJ DAVIDSON: Uh-huh.

15           MS. FRANCEZ: What manner?  Was it a gun  --

16           PJ DAVIDSON: He shot her.

17           MS. FRANCEZ: He shot her. Okay. And is he in

18      prison? Did he go to prison?

19           PJ DAVIDSON: No, he didn't.

20           MS. FRANCEZ: What were the circumstances, if

21      you don't mind me asking?

22           PJ DAVIDSON: It was basically domestic

23      violence.  They fought a lot.  I don't know.

24      Their children were there when it happened.

25           MS. FRANCEZ: Was he ever charged?

1        PJ DAVIDSON: No, ma'am.

2        MS. FRANCEZ: This is a real personal

3   question. Do you think he should have been

4   charged?

5        PJ DAVIDSON: Yes.

6        MS. FRANCEZ: Okay. Thank you.

7        (PJ Davidson not present.)

8        (Off-the-record discussion between the court

9   and counsel.)

10       (PJ Strother present.)

11       THE COURT: Ms. Strother, --

12       PJ STROTHER: Uh-huh.

13       THE COURT: -- tell me.

14       PJ STROTHER: A friend of mine, her -- she had

15   a domestic situation with her husband.

16       THE COURT: Okay. The fact that you had a

17   friend who had a problem -- we have a juror

18   leaving the courtroom.

19       THE CLERK: Mr. Arnold just left.

20       THE COURT: Mr. Arnold just left. We'll

21   handle that in a minute. He probably needed to go

22   to.

23       Would that fact that you know something about

24   a domestic violence charge in your family, would

25   that prevent you from rendering a fair and

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1        impartial verdict in this case?

2             PJ STROTHER: (Shakes head negatively.)

3             THE COURT:  You may be seated.

4             (PJ Strother not present.)

5             (PJ Schneider present at the bench.)

6             THE COURT:  Come on up, please, ma'am.

7             PJ SCHNEIDER: Regina Schneider.

8             THE COURT:  Yes, ma'am.

9             PJ SCHNEIDER: Yes.  My best friend was -- her

10       husband was very abusive.

11            THE COURT:  The fact that that occurred and

12       you know something about it and this case has to

13       do with a husband and a wife, would that impair --

14       affect or impair your ability to give these

15       parties a fair trial?

16            PJ SCHNEIDER: No, sir.

17            THE COURT:  Any questions?

18            MR. HUGHES:  Thank you.

19            (PJ Schneider not present.)

20            (PJ Osmon present at the bench.)

21            PJ OSMON: Randall Osmon.

22            THE COURT:  Tell us what your situation is.

23            PJ OSMON: I have a cousin who was murdered

24       along with her two children by an estranged

25       husband.

THE COURT:  Here in Mobile?

PJ OSMON: No. In Michigan.

THE COURT:  Were you close to them?

PJ OSMON: No, sir.

THE COURT:  Would the fact that you know something about that that occurred, would that affect your ability to render a fair verdict in this case?

PJ OSMON: No, it would not.  I also have a grand -- step-granddaughter whose father was convicted of molesting my step-granddaughter. And that was about a year ago here in Mobile.

THE COURT:  Same question:  Would that affect or impair your ability to render fair and impartial verdict?

PJ OSMON: No, sir.  Would not.

THE COURT:  Thank you.

(End of bench conference.)

THE COURT:  All right. I notice we're losing a few jurors and y'all may start throwing tomatoes at me if we don't take a break. We're going take a ten-minute comfort break.  And the restrooms are down in the middle of the hallway down there.  Let me do this real quickly:  Do not discuss this matter.  You have heard some things.  Do not talk

1    about it between yourselves, do not let anyone

2    talk to you about it.  If anybody attempts to do

3    that, you let me know.

4        If you could be back here at 25 minutes till

5    3:00 in the same location that you are now --

6    pardon me, 25 minutes until 4:00. It's either a

7    long day or a senior moment.  But y'all let me

8    apologize for keeping you because I know you are

9    uncomfortable.  Go ahead.  Y'all get out of here,

10   do what you have to do.

11       (Brief recess.)

12       (Defendant present.)

13       (Prospective jurors present.)

14       (A bench conference was held, during which

15   the following occurred:)

16       THE COURT:  It appears that Ms. Tunstall is

17   not upstairs on the 8th floor or downstairs

18   smoking. Can we proceed without her?  Would y'all

19   -- I mean, she has now been gone for 20 minutes.

20       MR. HALE: Do you want me to go get her?

21       THE COURT:  Well, I think somebody went down

22   to check.

23       THE CLERK: He called downstairs, the guard

24   did, for them to check down there for her.  And Jo

25   checked up at court administration.

1    MS. POWELL: Are you just going to do --

2    excuse her if she shows back up?

3    THE COURT:  I'm going to ask y'all if y'all

4    want to go forward with 29 as opposed to 30 by

5    excusing her because she hasn't shown back up.

6    MS. FRANCEZ: And, Judge, I believe there is

7    going to be a problem with the gentleman in the

8    back.  I just overheard one -- the one with the

9    hearing -- he hasn't heard anything.

10    THE COURT:  I was going to bring that up.

11    What was his name?  The man --

12    THE CLERK: Mr. Hare.

13    THE COURT:  Hare?  Mr. Hare has said that he

14    hasn't heard a thing that y'all have said.  He has

15    been trying to read lips.

16    MS. FRANCEZ: If you wanted to strike  --

17    (Off-the-record discussion.)

18    (Bench conference continued:)

19    THE COURT:  What do we do about Mr. Hare who

20    hasn't heard anything?

21    MR. HUGHES:  Judge, I think we need to put it

22    on the record at least, ask him, so that it shows

23    why he is being excused.

24    THE COURT:  We can bring him up here and do

25    that afterwards.  Okay?  I'm not going to go ahead

1   and embarrass him now. Still, --

2        MS. FRANCEZ: I don't know if these are going

3   to be witnesses, Judge, or not.

4        MS. POWELL: Just moral support.  They're not

5   going to be witnesses.

6        THE COURT:  Okay. Well, do y'all mind -- let

7   me just put it this way:  We don't have Ms.

8   Tunstall back here.  What do y'all want to do?

9        MR. HUGHES: Judge, can I look at my sheet one

10  second?

11       THE COURT:  Certainly. I haven't got her

12  saying anything, but go ahead.

13       MR. HUGHES:  She may not.  One second.

14       MS. FRANCEZ:  And if we excused the gentlemen

15  that had the hearing problem, it will be an even

16  28.

17       THE COURT:  Right.

18       (Off-record discussion.)

19       (Bench conference continued:)

20       MR. HUGHES:  We don't have any problem if you

21  want to excuse her.

22       THE COURT:  Then we'll excuse Hare and we'll

23  be even.

24       MR. HUGHES:  Okay. Just so we just have

25  something on the record about Mr. Hare.

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

| | |
|---|---|
| 1 | THE COURT:  We will.  Okay. |
| 2 | (End of bench conference.) |
| 3 | THE COURT:  Okay. Ladies and gentlemen, we |
| 4 | have one juror who is missing, and that's Ms. Inez |
| 5 | Tunstall. And I hope she is okay.  But the lawyers |
| 6 | have agreed that we will go forward without her. |
| 7 | And if she shows up I'm going to excuse her |
| 8 | service. |
| 9 | So if you will go ahead, Mr. Hughes. |
| 10 | Strike number three. |
| 11 | MR. HUGHES:  Ready to go forward? |
| 12 | THE COURT:  Uh-huh. |
| 13 | MR. HUGHES:  Have any of you, or your family, |
| 14 | or close personal friends ever sought protection |
| 15 | at the Pennelope House or any other facility for |
| 16 | protection from domestic violence? |
| 17 | (no response.) |
| 18 | MR. HUGHES:  Do any of you belong to any kind |
| 19 | of organization that treats or deals with domestic |
| 20 | violence, family abuse or spousal abuse? |
| 21 | Yes, sir?  If you want to come up here with |
| 22 | the judge, you certainly can. |
| 23 | PJ WASHINGTON:  I just work with family |
| 24 | abuse. |
| 25 | MR. HUGHES: All right.  How are you connected |

1    with that, sir?

2        PJ WASHINGTON: I work for Pettway

3    Residential.  It's a foster care for kids that've

4    either been in abusive homes or been exposed to

5    child neglect.

6        MR. HUGHES: All right. Mr. Washington?

7        PJ WASHINGTON: (Nods head affirmatively.)

8        MR. HUGHES:  Mr. Washington, is it just for

9    children and not adults?

10        PJ WASHINGTON: It's adults too, but most of

11    them are mentally retarded.

12        MR. HUGHES: All right. Thank you, sir.

13        Anybody else have a problem with that?

14        (No response.)

15        MR. HUGHES:  Ms. Francez asked earlier, and I

16    just want to make sure that I have it clear in my

17    head, that you heard and you will certainly know

18    that this case is spinning off of a divorce. Now,

19    some divorces work out well; some of them turn

20    very bad and very bitter, and they have a bad

21    effect on the parties and their family and

22    friends, and it's a tough situation.

23        Now, have any of you either yourself, or

24    close family members, or close family friends been

25    through what you might consider or what you would

1    say is a bitter divorce?  When I say that, every

2    divorce there is some animosity.  If you didn't

3    have some animosity, you wouldn't get a divorce.

4    I mean a bitter, a bitter relationship.

5         THE COURT:  You've got a hand.

6         MR. HUGHES:  Ms. Schneider.

7         Judge, can she come up?

8         PJ SCHNEIDER:  It's not necessary.

9         MR. HUGHES:  Okay.

10        PJ SCHNEIDER:  It's a family friend.  Me and

11   my husband's friend.  It was very bitter on both

12   sides.  Guns, whole nine yards.  But I tried to

13   stay out of it.  Me and my husband both tried to

14   stay out of it.

15        MR. HUGHES:  Were both the parties friends of

16   you and your husband?

17        PJ SCHNEIDER:  Yes.

18        MR. HUGHES:  And would that experience

19   influence your ability to reach a decision in this

20   case, assuming it's --

21        PJ SCHNEIDER:  No, sir.

22        MR. HUGHES:  -- it's stemming out of a

23   divorce?

24        PJ SCHNEIDER:  No, sir.

25        MR. HUGHES:  Have any of you ever been sued or

1    cross-examined by me, Ms. Powell, or Mr. Hale down

2    on the other end of the table?

3        (No response.)

4        MR. HUGHES:  Have any of you or your family

5    been involved in a neighborhood watch program or

6    any sort of these surveillance groups or

7    neighborhood watch or safety, or lookouts in the

8    neighborhood, whatever term they might go by?

9        Now, earlier on  --

10        THE REPORTER: Greg, you have a hand.

11        MR. HUGHES: I'm sorry. I'm sorry.

12        THE REPORTER: Very back.

13        MR. HUGHES: Whoever? Yes, sir. Okay, sir.

14        PJ ARNOLD: John Arnold.  Neighborhood watch.

15        MR. HUGHES:  Are you still involved in that,

16    sir?

17        PJ ARNOLD: Yes, sir.

18        MR. HUGHES: And do you do the patrol --

19        PJ ARNOLD: Yes.

20        MR. HUGHES:  --  part of it?

21        PJ ARNOLD: (Nods head affirmatively.)

22        MR. HUGHES: Thank you.

23        Ms. Schneider?

24        PJ SCHNEIDER:  Yes. Our neighborhood is just

25    getting started on one of those programs.

1       MR. HUGHES: Okay.

2       PJ SCHNEIDER: We have had the police and

3   firefighters come in and tell us what we needed to

4   do.

5       MR. HUGHES: Okay. So far have you been active

6   in that?

7       PJ SCHNEIDER: Not as active as I would have

8   liked.

9       MR. HUGHES: Okay. Anybody else? Yes, sir?

10      PJ MEDICUS: John Medicus.  Was part of one,

11  but it was disbanded about twelve years ago.

12      MR. HUGHES: And what part did you play in

13  that?

14      PJ MEDICUS: Just -- just patrolling at night.

15      MR. HUGHES: Anybody else?

16      (No response.)

17      MR. HUGHES: Earlier I believe Ms. Francez

18  asked if there was any reason why you couldn't

19  give Mr. Ball a fair trial.  You have heard a lot

20  of questions and you have heard some stuff from

21  the judge and heard some stuff from me since then.

22  Has any of this maybe sparked something in your

23  mind, whatever reason, it doesn't matter why, is

24  there anything in any of your minds that would

25  prevent you from giving Ray Ball a fair trial on

1   these charges?  Anything?

2       (No response.)

3       MR. HUGHES:   Thank you. Oh, Judge, I'm

4   sorry.  One other thing. Judge, there are two

5   witnesses that we neglected to qualify earlier

6   that may testify.

7       THE COURT:  Okay.

8       MR. HUGHES:  John McCade and Brandon H.

9   Ball. We may call those two.

10      Have any of you been exposed or seen any sort

11   of media coverage with regard to this case -

12   either TV, radio, newspaper, any other sort of

13   media coverage regarding this case?

14       (No response.)

15       MR. HUGHES: That's all.

16       THE COURT:  As to the two potential witnesses

17   Mr. Hughes has indicated, are any of you related

18   by blood or marriage to those witnesses?

19       (No response.)

20       THE COURT:  Are any of you close personal

21   friends or acquaintances of those witnesses, or

22   have you had any business dealings with those

23   witnesses?

24       (No response.)

25       THE COURT:  All right. In just a few minutes

1   the lawyers are going to begin striking this jury.

2   And I am going to put you out in the hall.

3   Frankly, there are a number of people out in the

4   hallway who may or may not be witnesses in this

5   case. And so it is very important that what I am

6   getting ready to say you completely - completely -

7   adhere to it; not that you shouldn't anyhow, but

8   because we have witnesses and other interested

9   parties out in that hallway, it's even more

10  important. Jurors and prospective jurors, you have

11  heard something about this case you have heard

12  something about the parties in this case, you know

13  very little, if anything, about the details and

14  facts in this case. The only thing that you are to

15  consider - and I will charge you as to the law in

16  this case at the conclusion of the facts - but the

17  only thing that you are going to consider is the

18  sworn testimony that comes from this witness stand

19  over here. Anything you may hear outside this

20  courtroom or see outside this courtroom cannot be

21  considered.  And if you do hear or see something

22  outside this courtroom, you need to report that to

23  me.  As a prospective juror being out in that

24  hall, I would like for you to make a special

25  effort not to be around anyone out there, to give

1    any kind of appearance that there is any kind of

2    problem going on. I do not want you and I instruct

3    you not to discuss this matter between yourselves,

4    not to allow anyone to discuss it with you or in

5    your presence, and obviously do not discuss it

6    with anyone else out there. If that occurs, please

7    tell me.  Because it is my job to make sure that

8    this case is run orderly, and that a fair and

9    impartial verdict is rendered, whatever it might

10   be, at the conclusion of this case. And as a juror

11   I know that you want the same.

12        Now, it's only going to take -- it shouldn't

13   only take but 15 or 20 minutes or so to strike a

14   jury. So don't get too far away from the door,

15   because I will have one of the ladies come out and

16   summons you back to the courtroom when we're ready

17   to select a jury and put the jury in the jury box.

18        Now, somebody asked whether or not we would

19   be finished doing what we're going to do today by

20   5:30.   The answer is yes. And the jury will not be

21   sequestered in this case.  You will be allowed to

22   go home.

23        So with that being the case, you are placed

24   in recess until you are summonsed back to be

25   selected as those who will serve on the jury.  Any

1     questions?

2          I would like for Mr. Hare if he would before

3     -- well, after y'all leave the courtroom, if Mr.

4     Hare would come to the front of the courtroom, I

5     would appreciate it.

6          And Ms. Tunstall, we started without you.

7          PJ TUNSTALL:  I got lost.

8          THE COURT:  And so we're going excuse you.

9     You are free to go until 9:15 in the morning.  And

10    you will have to report back to the 8th floor.

11    Okay?

12         All right.  Y'all are in recess.

13         (Prospective jurors not present.)

14         (PJ Hare present.)

15         THE COURT:  All right.  For the lawyers'

16    benefit too, Mr. Hare, you had indicated to Ms.

17    Biehl that you were having some difficulty

18    throughout the entire voir dire examination in

19    hearing what they were saying and you were doing

20    your best to read lips.  Is that right?

21         PJ HARE: Yeah.  I have got a new battery in

22    my hearing aid, but it just won't -- just not --

23    just not coming through right.

24         THE COURT:  Okay.

25         PJ HARE: I had to tell the first court that

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1    this morning too. It's just not.  I mean, I just

2    can't understand maybe 35 or 40 percent of what's

3    going on.

4         THE COURT:  Well, that being the cases, and

5    it's no fault of yours, it's apparently a failure

6    in your listening device, that being the case, I

7    have explained that and we've talked about it

8    among the lawyers, and they have agreed that

9    because of that we're going to excuse you from

10   service or as a prospective juror in this case.

11   But you are to report in the morning at 9:15 to

12   the 8th floor.

13        And when you get there in the morning tell

14   them because they will give you one of these to

15   help with your hearing.

16        THE CLERK: Did that seem to help now?

17        PJ HALE: Wasn't working too good. It was

18   cutting on and off.  And I would try to get it to

19   work and  --

20        THE COURT:  This device here?

21        THE CLERK: Did you have the -- I mean, it may

22   be that the batteries are dead.

23        PJ HALE: I changed them.

24        THE CLERK: You did change them?

25        THE COURT:  All right. Well, we'll try to get

MELODY LITTLE CAGLE, CSR
OFFICIAL COURT REPORTER

1    you something that works.

2        PJ HALE: Okay.

3        THE COURT:  Thank you for your service, sir.

4        (PJ Hale not present.)

5        THE COURT:  Are there any challenges?

6    Hearing none, how long will it take you, do you

7    think?

8        MR. HUGHES: Not a whole -- ten or fifteen

9    minutes or less.

10        THE COURT:  You can use the jury room.  The

11    Defense can use the jury room.

12        You will just have to fend for yourself.

13        MS. FRANCEZ: Yes, sir.

14        THE CLERK:  You'll have eight strikes each.

15        THE COURT:  Eight strikes each.

16        THE CLERK: And your eighth strike is your

17    alternate. Your eighth strike.

18        MS. FRANCEZ: Eighth strike?

19        MR. HUGHES: Eighth strike is our alternate.

20        (Brief recess.)

21        (Defendant present. )

22        (Jury and alternates struck.)

23        THE COURT:  Is the Defense satisfied?

24        MS. POWELL:  Would you give us just a moment?

25        MR. HUGHES:  Judge, one second.

1    (Pause.)

2    THE COURT:  Do we have any motions?

3    MR. HUGHES:  Yes, sir, Judge.

4    THE COURT:  All right.

5    MR. HUGHES: We move to -- I guess move for a

6    mistrial is the proper word for a Batson

7    challenge.  I think that's right. We're lodging a

8    Batson challenge.  I guess it would be a reverse

9    Batson challenge.

10    The State, out of fifteen white individuals,

11    used all eight strikes to strike white

12    individuals, used seven to strike white males, one

13    to strike a white female. Two -- some of those

14    there may be a reason, a race-neutral reason, but

15    two of those I see no discernible reason because

16    they really didn't say anything. And based upon

17    that, we would object to the use of the State's

18    strikes.  And we say it is discriminatory and

19    prejudicial to our client who is a white male.

20    THE COURT:  You are saying that it is

21    discriminatory that the State struck white people

22    when there is a white person on trial?

23    MR. HUGHES:  Judge, whichever way it is.  If

24    it's even used on one person, it doesn't matter if

25    the Defendant is white or black.  If they strike

1  them for reasons other than race-neutral reasons,

2  then that taints it, even if it is one.

3      They struck no blacks on the whole panel.

4  And, Your Honor, I would submit in light of the

5  our motion in limine that was here the other day

6  that that -- of course I'm not privy to what their

7  plans or thoughts are, but in light of the motion

8  where we tried to redact some of those statements

9  the other day, I think that is probative as to

10  where this was going.

11      THE COURT:  State have any response?

12      MS. FRANCEZ:  Judge, I don't believe that

13  Defense has made out a prima facie case to even go

14  forward with that. However, the State, using its

15  peremptory strikes, none of them were based on

16  gender or race.  It was based on other factors

17  that we took into consideration during voir dire.

18      And white male is not a protected class.

19      THE COURT:  Well, I have really never been

20  faced with a reverse <u>Batson</u> when the Defendant was

21  a Caucasian. Have you got any case law that says

22  that?

23      MR. HUGHES:  Judge, not with me. I didn't

24  know this was going to happen.

25      THE COURT:  Does that mean you don't?

```
1    MR. HUGHES:  That means I don't.  But I don't
2    think it matters what color the defendant is. If
3    they use their strikes in a discriminatory manner,
4    then it's bad no matter what it is.
5        THE COURT:  Would you agree with me that
6    every defendant has a right to a trial by a jury
7    of his peers?
8        MR. HUGHES:  Yes, sir.
9        THE COURT:  Would you agree with me that nine
10   whites, an oriental, and four blacks are a jury of
11   his peers?
12       MR. HUGHES:  It would appear so. But I think
13   they have -- the people that are excluded from
14   this make that an iffy proposition about whether
15   it's a jury of his peers.
16       THE COURT:  I'm going to deny your motion.
17       All right.  Do you want to bring them in?
18       MR. HUGHES:  Judge, that strike sheet, that
19   will be made part of the record; will it not?
20       THE COURT:  Yes.
21       (Prospective jurors present.)
22       THE COURT: All right.  We've got everyone
23   back.  The lawyers have concluded their strike
24   process.
25       When your name is called, please come up in
```

1    the order in which your name is called, the first

2    coming down to this entrance to the jury box down

3    here and go to the furthest chair on the back row

4    and you will remain in that order for the

5    remaining part of this trial.  So when you get

6    seated, look to your right and left to make sure

7    you know who your neighbor is.

8         Call the names, please.

9         (Jurors and alternates seated.)

10        (Remaining jury venire members excused.)

11        THE COURT:  Now, ladies and gentlemen of the

12   jury, if you would for maybe the last time, if you

13   would all rise, raise your right hand, please, and

14   take an oath to be a juror in this case.

15        (Jurors and alternates sworn.)

16        THE COURT:  Now, I promised you that you

17   would not be here later than 5:30 and I am going

18   to keep that promise.  But because the lawyers to

19   begin with will give opening statements and I'm

20   not going to limit them in the amount of time in

21   which they are going to need to give opening

22   statements, but I will tell you so that we can

23   move along, give you some idea of what we're going

24   to do in the next two or three days.  At the --

25   and I think we should be through with this case by